**CONECUH–MONROE COMMUNITY ACTION AGENCY, Appellant,**

v.

**Otis R. BOWEN, Secretary, United States Department of Health & Human Services, et al.**

**No. 87–5119.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 27, 1988.

Decided July 26, 1988.

James L. Feldesman, Washington, D.C., for appellant.

John C. Cleary, Asst. U.S. Atty., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court for appellees. Joseph E. diGenova, U.S. Atty.*, Royce C. Lamberth, Asst. U.S. Atty.*, Michael J. Ryan and Linda A. Halpern, Asst. U.S. Attys., Washington, D.C., were on the brief for appellees. R. Craig Lawrence and Wilma A. Lewis, Asst. U.S. Attys., also entered appearances for appellees.

Before MIKVA, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Conecuh–Monroe Community Action Agency ("Conecuh") sued the Department of Health and Human Services (HHS) to obtain funds for certain poverty programs in southwestern Alabama. Pending resolution of its claim that federal law required the funding, Conecuh moved for a preliminary injunction to obtain the funds on an expedited basis. The trial judge denied the motion and, at the same time, entered judgment for HHS on the underlying complaint. Conecuh appeals that decision.

To the extent the judge's reasons for entering final judgment can be discerned from his brief order, we find the rationale deficient. However, since this case turns entirely on a legal issue, we exercise our prerogative to resolve that issue here, instead of remanding the case. In doing so, we take judicial notice of a further administrative ruling in this case, which HHS issued subsequent to the trial judge's decision. In that ruling, HHS found that federal law did not require the funding that Conecuh seeks. Relying on familiar principles of deference to agencies' construction of their organic statutes, we conclude that HHS' interpretation of the law is reason-

---

* At time brief was filed.

able. On that basis, we affirm the trial court's decision.

## I. BACKGROUND

### a). *Statutory Framework*

This case involves rules designed to effect a transition from one mode of social services funding to another. In 1981, Congress abolished the Community Services Administration, a federal agency that funded local community action agencies (CAAs). These CAAs provide services for underprivileged persons at the local level. In place of the Community Services Administration, Congress established the Community Services Block Grant Program, which provides lump sums to state governments. One reason for adopting the block grant approach was to allow states to choose local providers of social services that the states themselves believe are best able to do the job. *See* S.Rep. No. 139, 97th Cong., 1st Sess. 908–09 (1981), U.S.Code Cong. & Admin. News 1981, pp. 396, 932–33.

In order to soften the blow to any CAAs that might lose their community services funding under the new block grant program, Congress required that states continue to fund the existing CAAs during the first year of the new regime. As it turned out, Congress renewed this "hold harmless" provision in each of the next two years. *See* 130 Cong.Rec. S13,405 (daily ed. Oct. 4, 1984) (remarks of Sen. Denton). This, of course, protected the stability of local CAAs but also defeated the flexibility that Congress intended to confer upon states under the block grant program.

Recognizing this problem, Congress struck a compromise between these competing objectives in the closing days of the 98th Congress. The compromise had two elements. First, states were given a limited right to substitute new organizations for the original CAAs; up to seven percent of each year's block grant could be directed to such new recipients. 42 U.S.C. § 9904(c)(2)(A) (Supp. II 1984). Secondly, the compromise established what one Senator aptly labeled a "rolling grandfather class:" any local agency presently receiving community services funding from a

state could only have its funding terminated in the following year if, "after notice[ ] and opportunity for hearing on the record, the State determines that cause existed for such termination subject to review by the Secretary." 42 U.S.C. § 9904(c)(11) (Supp. II 1984). The "Secretary" referred to in this statute is the Secretary of HHS, who distributes the block grants to states.

Two years after the enactment of this grandfather clause, a Senate Committee found the clause's protection of existing CAAs to be deficient and recommended remedial action:

> there have been instances in which States have terminated programs prior to the completion of this two-step [hearing and review] process. Moreover, the Committee has learned that the Secretary's review authority ... has been exercised as virtually a rubber-stamp approval of adverse State determinations.... [Thus, w]here a state terminates current or future funding levels of a [CAA] ... before completion of a State hearing and review by the Secretary, the Secretary must immediately assume responsibility for restoring the full level of funding to the organization.

S.Rep. No. 327, 99th Cong., 2d Sess. 26–27 (1986), U.S.Code Cong. & Admin.News 1986, pp. 2092, 2108–09 (report of the Senate Labor and Human Resources Committee). Congress adopted the Senate committee's recommendation: HHS is now required to provide direct funding to a local CAA whenever a state prematurely terminates its community services money. *See* 42 U.S.C. § 9905a(a) (Supp. IV 1986). This direct funding provision lies at the heart of the current case. Conecuh asserts that it should have received direct funding from HHS when the state removed a particular county from Conecuh's jurisdiction without a hearing or federal review. HHS contends that such loss of territory does not qualify as a "termination" and therefore does not trigger the direct funding obligation.

### b). *The Reduction in Funding*

In September 1986, the Alabama Department of Economic and Community Affairs

(Alabama) notified Conecuh that it would no longer receive community services funding for Clarke County, one of three counties that Conecuh served. Instead, Clarke County would be funded through a neighboring CAA, because Clarke's officials had complained that they were unrepresented on Conecuh's board of directors and received less than their share of services. The record contains conflicting evidence as to when this transfer of Clarke County became effective, but the date appears to be October 1, 1986. It is undisputed that there was no hearing on the decision to transfer Clarke County.

In early November, Alabama also notified Conecuh that it was withholding *all* funding, as of the beginning of that month, until Conecuh satisfactorily explained a "questionable cost" (unrelated to the present case) in Conecuh's records. This second notice was again issued without hearing or review. Conecuh petitioned HHS for direct funding to restore the full amount that had been terminated by Alabama's September and November notices. After considerable delay, HHS determined that the second termination was improper and that direct funding from HHS was required for that amount. HHS refused, however, to restore the lost funds formerly earmarked for Clarke County.

State officials have since resolved the "questionable cost" issue and restored state funding to Conecuh for the two counties that remain within Conecuh's jurisdiction. And the Secretary of HHS has since determined that the removal of Clarke County from Conecuh's jurisdiction was justified under the circumstances. Thus, the only issue remaining in court is whether HHS, prior to its final determination that the transfer of Clarke County was proper, should have provided direct funding to Conecuh for the amount formerly received for Clarke County. The value of this funding between the time of the Clarke County transfer on October 1, 1986 and the completion of HHS' investigation of the transfer in September 1987 is roughly $60,000.

## II. DISCUSSION

### a). *Mootness*

Before analyzing the trial court's decision, we must dispose of an issue that HHS injected into this case at the eleventh hour. On the day before oral argument of this appeal, HHS moved for dismissal on the grounds of mootness. Two justifications were advanced. First, even if the transfer of Clarke County was indeed a "termination"—such as should trigger direct funding—HHS claimed it was relieved of its duty to provide such funding once it finally determined, last September, that the transfer of Clarke County was proper. Secondly, HHS claimed that the resources for providing direct funding ceased to be available once Alabama's 1987 fiscal year ended, last October; HHS evidently believes direct funding cannot redress an improper termination that occurred in a prior fiscal year. Both of these contentions are without merit and betray a fundamental misunderstanding of the statutory scheme before us.

As indicated by the Senate report language that we quoted earlier, Congress' purpose in creating the direct funding provision was to give existing CAAs added protection against funding terminations that occurred without advance notice or a chance to be heard. Direct funding serves to deter states from circumventing the hearing and review procedures in the following way. Any direct funding that HHS is forced to provide by reason of a state's premature termination is, in turn, subtracted from the block grant the state receives from HHS. *See* 42 U.S.C. § 9905a(a) (Supp. IV 1986). The effectiveness of this deterrent would be substantially undermined if, as HHS maintains, it can initially withhold direct funding and then entirely dispense with such funding, when it ultimately finds that the termination was justified. The purpose of the statute is to guarantee CAA funding up until the time when HHS determines that a termination is proper. We find nothing in the statute to support HHS' contrary interpretation. Indeed, the 1986 Senate report asserted that "the Secretary must *immediately* assume

responsibility for restoring the full level of funding to the organization" when a CAA is prematurely terminated. S.Rep. No. 327, 99th Cong., 2d Sess. 27, U.S.Code Cong. & Admin.News 1986, pp. 2092, 2133 (1986) (emphasis added).

■ HHS' second rationale for finding mootness—that fiscal year 1987 has ended —is no more persuasive. The statutory guarantee of direct funding is not contained in an annual appropriations bill; it is written into the authorizing statute that governs the block grant program. The statute simply requires that HHS provide direct funding to a CAA "*[w]henever* a State violates the assurances [that it gives not to] terminate[ ] the funding of a community action agency ... prior to the completion of the State's hearing and the Secretary's review...." 42 U.S.C. § 9905a(a) (Supp. IV 1986) (emphasis added). Thus, direct funding is in no way tied to a particular fiscal year.

HHS' objection to our jurisdiction not only proves to be unwarranted but is tardy. The two facts on which mootness is premised (namely, HHS' finding that the Clarke County transfer was proper and the fact that fiscal year 1987 has ended) were obviously known to HHS eight months ago. At oral argument, counsel explained the belated recognition of the mootness problem by noting that he had only recently been assigned to argue the case. This suggests a systemic problem that needs to be addressed.

b). *Entitlement to Direct Funding*

We turn, then, to the issue of whether Conecuh was ever entitled to direct funding in the first place. The district court considered this question on Conecuh's motion for preliminary injunction. The court apparently became convinced, however, that Conecuh had no prospect of prevailing on the merits. The court's terse order gave three reasons why Conecuh was not entitled to direct funding and then entered final judgment in favor of HHS. Because the preliminary injunction question thus merged into the final judgment, we must examine the court's conclusion that Conecuh did not suffer a "termination."

(1) *The Trial Court's Grant of Final Judgment*

The three grounds advanced by the court for rejecting Conecuh's claim were these: (1) HHS' "initial determination" that Conecuh had no claim for direct funding (communicated to Conecuh in a February 1987 letter) was "reasonable," (2) "[i]t would be inappropriate to require double funding of Clarke County" since that county had been annexed to another CAA, and (3) there was a possibility that Conecuh would still secure some administrative relief because HHS was "considering this issue as a complaint under 42 U.S.C. Sec. 9908(a)(2)." *Conecuh–Monroe Community Action Agency v. Bowen*, C.A. No. 87–246, Memorandum Order at 1 (D.D.C. March 18, 1987). None of these grounds is adequate to support final judgment against Conecuh.

■ a). *HHS' "Initial" Decision:* The court's reliance on HHS' initial decision as "reasonable" does not support the entry of final judgment for two reasons. If the decision really was "initial" in the sense that HHS had not yet finally determined whether Conecuh suffered a termination, then whether or not that decision was "reasonable" is not dispositive of Conecuh's court claim. The doctrine under which courts defer to agencies' "reasonable" interpretations of their own statutes, *see Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), applies when agencies have finally interpreted those statutes. It cannot be invoked where an agency is still considering what interpretation it will ultimately adopt.

The court's description of HHS' decision as "initial" is perhaps not important. The court may, in fact, have believed that HHS had found conclusively that Conecuh did not suffer a termination. (HHS had promised to examine further whether the transfer of Clarke County was justified and proper, and in this sense the agency's first decision was still "initial.") Even if the court believed HHS had definitively decided

the termination issue, however, it could not have found HHS' decision to be "reasonable." HHS simply had not offered a reasoned basis for denying direct funding to Conecuh. At the time of the court's ruling, HHS' only statement on this subject was its February 1987 letter to Conecuh. That letter stated:

> Due to the immediacy of the situation, we made an initial determination that [the two-county amount] was the correct funding level, given the annexation of Clark [sic] County with [another CAA] on October 1, 1986. We will treat your request for additional funds as a complaint pursuant to the complaint procedures.

Letter of 2/26/87 from HHS to Conecuh, *reprinted in* appellee's brief at A–15. These sentences give almost no clue as to what interpretation of the block grant law HHS relied on in denying direct funding. The district court added nothing of its own to explain what legal theory should be inferred from HHS' oblique decision. In sum, *the court could not justify entry of final judgment by relying on the "reasonableness"* of HHS' first decision.

■ b). *Double Funding:* The trial court's second ground for rejecting Conecuh's claim was that it would be "inappropriate" to fund Clarke County twice. The court evidently believed that, if Conecuh were given direct funding, Alabama would continue to fund the new agency that the state had designated to deliver services in Clarke County; the county would thus receive twice its share of money until the dispute was resolved. This prediction is not necessarily correct. As soon as HHS begins direct funding, it must reduce *pro tanto* the amount of the state's block grant. Faced with this reduction, a state might well suspend its funding to the new organization in the affected county, pending completion of the Secretary's review. (Suspending the funding of a newly designated CAA need not be a proscribed "termination" in its own right; only organizations that have received community services funds in the previous year are protected from sudden terminations. 42 U.S.C. § 9904(c)(11) (Supp. II 1984).)

Even if a state does not desist from funding the new agency, however, the double funding argument proves too much. When a state terminates a CAA in a manner that clearly *does* trigger direct funding under the block grant law (e.g., when a state suddenly cuts off all funds to a CAA, rather than merely transferring one of the CAA's counties to another agency), that state can be expected to designate a new agency to provide community services in the affected area. Since the CAA that thus loses its funding will have been prematurely terminated, it will be entitled to direct funding. Accordingly, HHS will face the same "double funding" dilemma that the trial court perceived in the present case. In sum, if the possibility of "double funding" suffices to prevent direct funding, it will do so in nearly every instance; the trial court's premise could eliminate direct funding entirely. We conclude that Congress accepted the prospect of some "double funding" as the price for protecting existing CAAs from sudden terminations.

■ c). *Further Administrative Relief:* The trial court's last reason for entering judgment against Conecuh was that HHS had not yet finished examining whether the Clarke County transfer was proper; thus, there was still a possibility that the transfer might be disapproved. The fact that HHS might still have countermanded the transfer of Clarke County has no bearing on whether Conecuh was entitled to direct funding in the interim. The direct funding provision was meant to protect CAAs' entitlement to process—to notice, a hearing, and federal review—before funding is cut off. A court suit to enforce that entitlement cannot be terminated on the ground that other relief may be available in the future. In sum, none of the trial court's reasons for entering judgment against Conecuh permits us to uphold that result.

\* \* \* \* \* \*

■ Having decided that the district court's opinion cannot stand, we ourselves must determine whether HHS' decision to withhold direct funding from Conecuh was

correct. We are aided in our inquiry by the fact that, since the trial court's ruling, HHS has rendered a final decision on Conecuh's petition for direct funding. HHS included that opinion in its submissions on this appeal, and Conecuh did not object to this addition to the record. We find that the agency's fuller statement of its legal position enables us to resolve Conecuh's claim. Normally, of course, an appellate court does not take notice of materials not contained within the trial court record. However,

> [i]n the interest of justice, and to provide sound disposition of precedential questions of law, an appellate court may on occasion refer to factual items lodged by the parties, even though not strictly part of the record, at least where there is no significant factual issue and no purpose would be served by a remand.

*United States v. Kearney,* 420 F.2d 170, 173 n. 4 (D.C.Cir.1969). In this case, the issue to be resolved is entirely legal, and we therefore find that it can be resolved as readily here as in the district court; "no purpose would be served by a remand." We note that Conecuh has not challenged HHS' final decision—either in a separate proceeding or here—as being factually erroneous; only the legal conclusion is contested. Thus, there is no reason not to refer to HHS' final decision in conducting our legal analysis. We are, of course, free to uphold the trial judge's decision on grounds that are different from the ones he expressed. *Nelson v. United States* 838 F.2d 1280, 1285 (D.C.Cir.1988).

### (2) *The Transfer of Clarke County*

In reviewing whether the transfer of Clarke County constituted a "termination" within the meaning of the block grant statute, we are mindful of the analytical framework that guides our inquiry.

> On a pure question of statutory construction, our first job is to try to determine congressional intent, using "traditional tools of statutory construction." ... However, where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on

> a permissible construction of the statute."

*NLRB v. United Food & Commercial Workers Union, Local 23,* —— U.S. ——, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (quoting, respectively, *INS v. Cardoza-Fonseca,* 107 S.Ct. 1207, 1221 (1987) and *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)).

Before we undertake our "first job" of ascertaining congressional intent, it is useful to clarify the question before us. Both parties on this appeal frame the issue as whether a "partial reduction" of a CAA's funding constitutes a "termination." The issue is in fact more specific: whether the transfer of a county from one CAA's jurisdiction to another's constitutes a termination with respect to the first CAA. This appears to be a question of first impression in the courts.

In assessing whether Congress intended such transfers of geographic authority to qualify as a termination, we find little help from the statute's own language. Under the block grant law, a state must simply promise that no CAA that currently receives funds will "have its present or future funding terminated under this Act unless after notice, and opportunity for hearing ..., the State determines that cause existed ... subject to review by the Secretary." 42 U.S.C. § 9904(c)(11) (Supp. II 1984). In addition, the Secretary of HHS must begin direct funding "[w]henever a State violates the [foregoing] assurances ... and terminates the funding of a community action agency ... prior to the completion of the State's hearing and the Secretary's review." 42 U.S.C. § 9905a(a) (Supp. IV 1986). These provisions do not, by themselves, make clear what "terminate" means. On the one hand, common usage suggests that the word means a complete cut-off of funding. On the other hand, Conecuh points out that "terminate," in other federal grants programs, has come to include mere reductions in funding. Appellant's brief at 12 (citing OMB Circulars A–102 & A–110, as well as 45 C.F.R. § 74.110 (1987)).

When we turn to the legislative history of the block grant statute, however, we are no longer uncertain as to congressional intent. As previously noted, Congress' purpose in enacting the "hold-harmless" provision in 1981, the "rolling grandfather clause" in 1984, and the "direct funding" requirement in 1986 was to protect the designation of existing CAAs as the community services providers for their areas. As of the 1984 amendment, no state could replace an existing CAA with another organization of the state's choosing without first giving notice and a right to be heard. We think it clear, therefore, that when a state transfers part of a CAA's jurisdiction to another organization this normally constitutes a "termination."

On appeal, HHS argues that such transfers of counties cannot qualify as terminations—indeed, may not even constitute "reductions"—because the only thing that is changed is the agency distributing the money, not the amount of money allocated to the transferred county. Appellee's brief at 15–16. Such an interpretation would quickly destroy Congress' protection of CAAs. In HHS' view, a state can carve up a CAA's jurisdiction, distributing its parts to other organizations, without ever risking a "termination." We reject this broad argument.

However, HHS' final ruling against Conecuh last September appeared to rest on narrower grounds. In that decision, HHS stressed a significant fact about Clarke County (the county that Alabama removed from Conecuh's jurisdiction) that is nowhere mentioned on this appeal. The crucial fact is that Clarke County was not served by a federally funded CAA at the time that the block grant statute was enacted. Therefore, until 1982, Clarke County did not receive community services funding through Conecuh or through any other organization. It is this factor that we think allows HHS to find that Conecuh did not suffer a "termination." To understand why Clarke County's status is crucial to the termination issue, we review one other aspect of the block grant statute.

When Congress first enacted the block grant program, many states evidently faced the problem that Alabama faced with respect to Clarke County. That problem was how to target community services funds to poor people in unserved counties. The states could not channel such funds directly to those counties because of the way Congress structured the "hold harmless" clause in the original block grant statute. That clause's "pass through" provision required that 90 percent of a state's block grant be distributed to CAAs already in existence (referred to as "eligible entities").

Thus, the only way to help unserved areas was to annex them to existing CAAs. In this manner, funds expended in the annexed areas would fall within the 90 percent pass-through. Congress made this point explicit in 1984. At the same time that it added the "rolling grandfather clause," Congress inserted another amendment, directing states to pursue specific annexation options for areas not currently served by an "eligible entity" (i.e., an existing CAA). Congress set forth these annexation options in descending order of preference; the first preference was that States "reques[t] an existing eligible entity which is located and provides services in an area contiguous to the new area to serve the new area." 42 U.S.C. § 9902(1)(A) (Supp. II. 1984).

Prior to this 1984 amendment, Alabama annexed Clarke County to Conecuh, whose territory was adjacent to Clarke. In doing so, Alabama followed the presumed intent of the block grant statute, which Congress formally codified in its subsequent amendment. As we have noted, the annexation proved unsatisfactory to the Clarke County Commission. Accordingly, at the Clarke Commission's request, Alabama transferred Clarke County to the Baldwin–Escambia CAA. Like Conecuh, Baldwin was an "eligible entity ... in an area contiguous" to Clarke County.

The precise question posed in this case, then, is whether the transfer of a county between two existing CAAs, neither of which originally served that county, consti-

tutes a termination of the CAA that loses the county. Moreover, the question involves two particular CAAs that, under the terms of the block grant statute, enjoy equal priority in their claim to serve Clarke County (since they are both contiguous to it). As to whether Congress intended this sort of transfer to constitute a termination, even the legislative history is ambiguous. Whether we find that Conecuh suffered a termination thus hinges on our understanding of Congress' purpose in protecting CAAs. One possibility is that Congress wanted to protect individual CAAs from suffering any sudden loss of funding which could disrupt their operations. Under this view, even the transfer of a recently annexed county from one CAA to another would constitute a termination within the meaning of the block grant statute's protections.

There are other purposes, however, that Congress may have had in mind when it protected CAAs. Congress may have made it more difficult for states to terminate existing CAAs because it wanted states to draw on those CAAs' experience and expertise instead of turning to non-CAAs to deliver community services. And Congress may also have been catering to vested interests: the CAAs' class interest in serving new areas brought under the block grant. If Congress was motivated by either a concern about expertise or a desire to protect vested interests, the procedural protections that Congress wrote into the block grant statute may not have been intended to protect a CAA that loses a recently acquired county to another CAA. We note that the block grant statute gives neither Conecuh nor Baldwin an initially superior claim to represent Clarke County, since both are contiguous to it. Therefore, regardless of whether Conecuh or Baldwin was first designated to represent Clarke County, the statute may well permit Alabama to subsequently transfer Clarke County to the other CAA without first holding a hearing and without waiting for federal review. Such a transfer, in other words, may not qualify as a protected "termination."

Since the statute and legislative history are ambiguous as between these readings of congressional intent, we necessarily find the latter view of congressional intent—that Congress sought to preserve CAAs' expertise or protect their vested interests—to be a "reasonable" interpretation of the statute. And it is this latter view of congressional intent that informed HHS' final rejection of Conecuh's request for direct funding, last September. *See* Letter of 9/2/87 from HHS to Conecuh, *reprinted in* appellee's brief at A–24 to A–30 (hereafter "HHS Letter"). We believe HHS' decision sufficiently tracks the "expertise" and "vested interest" theories of congressional intent that we may uphold it on that basis. While "we may not supply a reasoned basis for the agency's action that the agency has not itself given[, we can] 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (citations omitted).

HHS' final decision against Conecuh stressed the fact that Clarke County was unserved (as of 1981) by any CAA. HHS also noted that "a decision was made [by Alabama] to have CAAs with geographically adjacent counties administer the funds allocated to [such] 'uncapped' counties." HHS Letter at A–25. (It appears that "uncapped" means "unserved;" we surmise that this term may derive from such counties' lack of a community action program, or CAP.) HHS then recounted Clarke County's annexation to Conecuh, the unsatisfactory results of that merger, and the subsequent annexation to the Baldwin CAA. From this history, HHS "determined that there was no actual reduction in [Conecuh's] funding as the funds set aside for Clarke County were distributed to Clarke County, albeit through another eligible entity." *Id.* at A–27. While the legal reasoning behind this conclusion is "of less than ideal clarity," we think its "path may be reasonably discerned." HHS found that the transfer of an "uncapped" county (i.e., a county that originally had no CAA) from one existing CAA to another did not "ter-

minate" the first CAA, such as would require a state hearing (or direct funding from Washington, pending that hearing). We believe this interpretation of "terminate" is a permissible construction of the block grant statute and that HHS' final decision should therefore be upheld.

■ There remains one other matter to consider. Conecuh alleges that the transfer of Clarke County was effected by an improper amendment of a state plan. The appendix to Alabama's 1987 community services plan listed Clarke County as still within Conecuh's jurisdiction. The governor of Alabama forwarded that plan to HHS in September 1986, after Conecuh had learned that it would lose Clarke County. In early October, the chief of Alabama's Community Services Division notified HHS of the transfer of Clarke County and the consequent amendment of the state plan. Because the block grant statute provides that the "chief executive officer of each State may revise any [state] plan," 42 U.S.C. § 9904(d)(1) (1982), Conecuh vigorously contends that the plan's revision by one of Alabama's division chiefs was ineffective.

We leave aside the question of whether Alabama's governor could (or did) delegate his statutory authority to the community services chief. The short answer to Conecuh's objection is that, although state plans must specify "geographic areas to be served" and "the criteria and method established for the distribution of funds," nothing in the law requires a state plan to specify which CAA is going to serve a particular county. *See* Omnibus Budget and Reconciliation Act, Pub.L. No. 97–35, § 1742(a), 95 Stat. 357, 763 (1981) (incorporated by reference in 45 C.F.R. § 96.10 (1987)); *see also* 42 U.S.C. § 9904(d) (1982). To be sure, Alabama's amendment of its state plan did inform HHS about the transfer of Clarke County out of Conecuh's jurisdiction. But since that information was not a required part of the plan, the fact that it was inserted in the plan by an allegedly improper amendment would—at most—permit HHS to reject the amendment. Nothing in the block grant law gives Conecuh a right to reclaim lost terri-

tory on the grounds that HHS learned that Conecuh had lost this territory by means of an improper amendment to the state plan. We need not decide whether a local agency could challenge an amendment to a state plan that reduced the funding for a geographical area that the agency served.

## III. CONCLUSION

When Congress enacted the community services block grant program in 1981, its aim was "that States be provided with the broadest possible latitude in the use of block grant funds." S.Rep. No. 139, 97th Cong., 1st Sess. 909 (1981), U.S.Code Cong. & Admin.News 1981, pp. 396, 933. Nevertheless, that same statute hedged states' freedom, requiring that existing CAAs receive funding preferences. Subsequent Congresses added further protections for CAAs, including the one at issue in this case: a CAA whose funding is terminated without a state hearing or federal review is entitled to direct funding from HHS, pending resolution of the dispute.

In the trial court proceedings, neither HHS nor the court recognized the full extent of the protections conferred on CAAs. However, the agency's subsequent decision —finally denying direct funding to Conecuh—relied on special facts in this case. The contention that these facts bring the case outside the scope of the direct funding protection is a permissible construction of the block grant statute. We can therefore uphold the agency's decision on these narrower grounds. Accordingly, the district court's decision is

*Affirmed.*