# Legal Authority of the Department of the Treasury to Issue Regulations Indexing Capital Gains for Inflation

The Department of the Treasury does not have legal authority to index capital gains for inflation by means of regulation.

September 1, 1992

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

You have asked for our opinion whether the Department of the Treasury ("Treasury") has legal authority to amend its regulations to index capital gains for inflation. In connection with that request, you have provided us with your legal opinion concluding that Treasury does not have such authority. Opinion of the General Counsel (Aug. 28, 1992) ("Treasury Memorandum") In reaching that conclusion, you consider in detail, and specifically reject, arguments presented by the National Chamber Foundation in the form of a legal memorandum prepared by its private counsel, which concludes that Treasury has such legal authority. *See* Memorandum for Dr. Lawrence A. Hunter, Executive Vice President, National Chamber Foundation, by Charles J. Cooper, *et al.* (Aug. 17, 1992) ("NCF Memorandum").

We have carefully reviewed the arguments set forth in the Treasury Memorandum and the NCF Memorandum. As a result of that review, and of our own research and analysis, we are compelled to agree with Treasury's legal conclusion that Treasury does not have legal authority to index capital gains for inflation by means of regulation.[1]

## I.

Section 1001(a) of the Internal Revenue Code ("Code") provides that "[t]he gain from the sale or other disposition of property shall be the excess

---

[1] Were we to disagree with your conclusion, and were Treasury to adopt a regulation of the sort proposed by the NCF Memorandum, we expect that the regulation would be challenged in court. Accordingly, we have consulted with the Department of Justice's Tax Division, the litigating division that would be responsible for defending any such indexing regulation. That division concurs fully in the conclusions set forth herein.

of the amount realized therefrom over the adjusted basis provided in section 1011." The general rule of section 1011(a) is that a property's adjusted basis is its "basis (determined under section 1012 . . .), adjusted as provided in section 1016." Section 1012 defines the basis of property as generally "the cost of such property." Although the term "cost" is not further defined in the Code, since the inception of the federal income tax system following ratification of the Sixteenth Amendment in 1913, Treasury has consistently interpreted the statutory term "cost" to mean price paid. Compare, e.g., T.D. 2090, 16 Treas. Dec. Int. Rev. 259, 273 (1914) ("The cost of property acquired . . . will be the actual price paid for it . . . ."), with 26 C.F.R. § 1.1012-1(a) (1992) ("The cost [of property] is the amount paid for such property in cash or other property."). The current regulation dates from 1957. See T.D. 6265, 1957-2, 12 C.B. 463, 470.

The sole issue presented by your request is whether Treasury may, by amending its regulations, reinterpret the statutory term "cost" to mean the price paid as adjusted for inflation. The NCF Memorandum argues that Treasury may do so. In making that argument, the Memorandum relies heavily on analysis of the Supreme Court's decision in Chevron U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837 (1984).[2] Chevron announced a two-step rule for courts to follow when reviewing an agency's construction of a statute that it administers. The court must always first examine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843. As the Court noted in Chevron, "'[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" Id. (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)). But any such "gap" must be created by Congress: "assertions of ambiguity do not transform a clear statute into an ambiguous provision." United States v. James, 478 U.S. 597, 605 (1986).[3]

---

[2] See NCF Memorandum at 1 ("We must stress at the outset that our analysis of this question depends heavily on the standard of judicial review that would apply to such a regulation [under Chevron]."); id. at 12 ("The framework for analyzing the issue under study is provided by the Supreme Court's landmark Chevron decision."); id. at 21 ("In the terms of the Chevron doctrine, the question is whether Congress has . . . delegated authority to the Treasury to interpret the statute."); id. at 23 ("Accordingly, the basic question under Chevron is whether the term 'cost' is amenable to a construction that takes account of inflation.").

[3] Two members of the Supreme Court have suggested that an agency construction should prevail if the statute is merely "arguably ambiguous." See K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 293 n.4 (1988) (opinion of Kennedy, J., joined by White, J.). The NCF Memorandum's characterization of the "arguably ambiguous" standard as the view of "the Court" in that case, id. at 22 n 11, however, is plainly mistaken. Only two Justices embraced that view, and they expressly took issue with the refusal of four other members of the Court to recognize the alleged ambiguity. See K. Mart Corp., 486 U.S. at 293 n.4.

The NCF Memorandum's central argument rests on the proposition that "cost" is an ambiguous term. In essence, the Memorandum argues that Congress, in using that word, left a "gap" in the statutory scheme to be filled by Treasury in the exercise of its rulemaking power under the Code. Specifically, the NCF Memorandum asserts that the "meaning of 'cost' is sufficiently ambiguous to permit the exercise of administrative discretion" to interpret cost in a manner that takes account of inflation, *id.* at 23, and consequently that in light of *Chevron*, "a regulation indexing capital gains for inflation should and would be upheld judicially as a valid exercise of the Treasury's interpretative discretion under the [Code]," *id.* at 1.[4]

*Chevron* is a profound expression of principles that flow from the doctrine of separation of powers. The decision recognizes the appropriate roles of each of the three branches of government. Congress writes laws; the executive branch interprets and enforces them. Congress may, however, leave greater or lesser scope for Executive action. Thus, Congress often leaves to the executive branch the task of filling in the gaps in the statutory scheme through interpretation, and courts must then defer to the Executive's reasonable interpretations. As the *Chevron* Court explained:

---

[4] Although we agree with the conclusion of the NCF Memorandum that *Chevron* provides the framework for analyzing this issue, we note that there remains some confusion in the case law on this point. In *Cottage Savings Ass'n v. Commissioner*, 499 U.S. 554 (1991), the Supreme Court considered a challenge to a Treasury regulation interpreting a provision of the Code. The Court noted that Congress had given Treasury the broad power "to promulgate 'all needful rules and regulations for the enforcement of [the Internal Revenue Code].'" *Id.* at 560 (quoting I.R.C. § 7805(a)). Based on that grant of authority, the Court held that it "must defer to [Treasury's] regulatory interpretations of the Code so long as they are reasonable." *Id.* at 560-61 (citing *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476-77 (1979)). The Court made no reference to *Chevron* or its progeny.

Whatever the significance of the Court's failure in *Cottage Savings* to cite *Chevron*, we have found no case that has expressly rejected application of *Chevron* to regulations interpreting the Internal Revenue Code. Some lower court cases apply the *National Muffler* standard without considering *Chevron, see, e.g., Davis v. United States*, 972 F.2d 869 (1992), while others cite both cases without resolving any supposed inconsistency between them, *see, e.g., American Medical Ass'n v. United States*, 887 F.2d 760, 770 (7th Cir. 1989). Two courts of appeals, however, expressly applied *Chevron* to interpretative regulations under the Internal Revenue Code. *See RJR Nabisco, Inc. v. United States*, 955 F.2d 1457, 1464 (11th Cir. 1992); *Peoples Federal Sav. & Loan Ass'n v. Commissioner*, 948 F.2d 289, 299 (6th Cir. 1991). A third court of appeals declined to choose between them, because on the facts of the case, either standard would have compelled the same result. *Pacific First Fed. Sav. Bank v. Commissioner*, 961 F.2d 800, 803 (9th Cir.) (noting, however, that much of the reasoning in *Peoples Federal* was persuasive), *cert. denied*, 506 U.S. 873 (1992). *Cf. Georgia Fed. Bank v. Commissioner*, 98 T.C. 105, 107-08, 118 (1992) (rejecting Sixth Circuit's conclusions in *Peoples Federal*, but applying *Chevron* principles).

Even if we assume that application of the *National Muffler* test rather than the *Chevron* test can produce different results in some cases, as applied here *National Muffler* would not alter our conclusion. The *National Muffler* standard requires that a regulation "harmoniz[e] with the plain language of the statute, its origin, and its purpose." 440 U.S. at 477. This permits not a plenary review by the court, but rather a determination whether the regulation is a "reasonable" interpretation of the statute. *Id.* at 476. Because the interpretation advanced in the NCF Memorandum is contrary to the plain language of the statute, it would fail the *National Muffler* test as well as the *Chevron* test.

In addition, we note that the Treasury Memorandum cites several decisions in which the courts of appeals have continued to apply — in the wake of *Chevron* — the traditional distinction between "legislative" and "interpretive" regulations in determining how much deference is due Treasury's interpretation of the Code. Treasury Memorandum at 41-42. Under this regime, "legislative" regulations generally are accorded greater deference than are "interpretive" regulations. We need not address the issue of *Chevron*'s impact upon this traditional distinction here, because in either case the plain meaning of the statute will control. We note, however, that the Supreme Court has not conclusively resolved this issue.

While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices — resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

467 U.S. at 865-66.

*Chevron* is thus a powerful analytical tool for the smooth administration of complex statutes and for the defense of agency actions under such statutes. It is not, however, unlimited. *Chevron* also teaches that when Congress writes legislation in specific terms, if it does not leave policy choices to be resolved by an administrative agency, then Congress's decision binds both the executive branch and the judiciary. To repeat: "If the intent of Congress is clear, that is the end of the matter." *Id.* at 842. In particular, *Chevron* does not furnish blanket authority for the regulatory rewriting of statutes whenever a dictionary gives more than a single definition for a statutory term or whenever some arguably relevant discipline assigns a specialized, technical meaning to such a term. Such a reading of *Chevron* would eviscerate the well-established rule of construction that statutes must be accorded their plain and commonly understood meaning.[5] Indeed, it would lead to a legal regime in which many statutory terms with widely understood meanings would be deemed "ambiguous." In this regard, we fully concur in your conclusion that "[i]f the plain meaning doctrine could be applied only to words that have only one conceivable meaning, it would have precious little utility as a principle to resolve conflicting interpretations of statutes." Treasury Memorandum at 7-8.[6]

---

[5] This rule of construction, like *Chevron* itself, sounds in the separation of powers under the Constitution and thus is an important limitation on judicial power. *See In re Sinclair*, 870 F.2d 1340, 1344 (7th Cir. 1989) (Easterbrook, J.).

[6] Accordingly, courts have generally been reluctant to treat the meaning of a single word or a short phrase as other than a "pure question of statutory construction" on which courts will not defer to agencies. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987). Courts have rejected agency interpretations of such words or terms in favor of the courts' own reading of the statutory language. *See, e.g., Conecuh-Monroe Community Action Agency v. Bowen*, 852 F.2d 581, 588-89 (D.C. Cir. 1988) (meaning of "terminate"); *Telecommunications Research & Action Ctr. v. FCC*, 836 F.2d 1349, 1357-58 (D.C. Cir. 1988) (meaning of "system of random selection"); *Santa Fe Pac. R.R. v. Secretary of Interior*, 830 F.2d 1168, 1174-80 & n.91 (D.C. Cir. 1987) (meaning of "lieu selection . . . right").

Surprisingly, the NCF Memorandum nowhere discusses the plain meaning rule, despite its obvious importance to the legal analysis. The omission is significant, because the methodology adopted by the NCF Memorandum would undermine the rule. Of course, the availability of two clearly inconsistent and equally plausible alternative dictionary definitions can in some circumstances "indicate[] that the statute is open to interpretation," *National R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 418 (1992), particularly if the overall statutory context of the provision at issue provides evidence that the agency's proffered interpretation is a reasonable one, *id.* Clearly, however, the mere existence of

Continued

139

*Chevron* teaches that the inquiry into the meaning of a statutory term — including whether that meaning is ambiguous — is to be conducted by "employing traditional tools of statutory construction." 467 U.S. at 843 n.9. *See also INS v. Cardoza-Fonseca*, 480 U.S. at 449 (using "ordinary canons of statutory construction" to ascertain the meaning of statutory terms). These tools and canons include examination of "the plain language of the Act, its symmetry with [other relevant legal materials], and its legislative history." *Id.* Additionally, "[i]n ascertaining the plain meaning of the statute, the court must look to . . . the language and design of the statute as a whole." *K Mart Corp.*, 486 U.S. at 291.

In reaching its ultimate conclusion that Treasury lacks the legal authority to index capital gains for inflation, your opinion considers and rejects the NCF Memorandum's arguments that the term "cost" is ambiguous. It concludes that "[t]he statute itself has a plain meaning which is clear and unambiguous: cost means the 'actual price paid' or 'purchase price.' " Treasury Memorandum at 1. *See also, e.g., id.* at 4-8. As set forth below, we also conclude that "cost" is not ambiguous in the context of determining gain or loss from the disposition of property.

## II.

### A.

We must begin with what the Supreme Court has called a "fundamental canon of statutory construction" that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). The fundamental canon, of course, applies with full force to the tax laws. *See, e.g., Crane v. Commissioner*, 331 U.S. 1, 6 (1947) ("[T]he words of statutes — including revenue acts — should be interpreted where possible in their ordinary, everyday senses."); *Old Colony Trust Co. v. Commissioner*, 301 U.S. 379, 383 (1937) ("The words of the statute are plain and should be accorded their usual significance in the absence of some dominant reason to the contrary.");

---

[6](....continued)
alternative dictionary definitions will not establish "ambiguity." Were that so, the dictionary would become an irresistible engine for destroying the plain meaning rule. In practice, of course, the courts rely on dictionary definitions to *establish*, rather than obscure, plain meaning. *E.g., United States v. Rodgers,* 466 U.S. 475, 479-80 (1984) (rejecting "alternative definition" of term "jurisdiction" provided by dictionary in favor of "[t]he most natural, nontechnical reading" provided by same source). *See also Mallard v. United States District Court,* 490 U S. 296 (1989), *discussed infra.* As we shall demonstrate, there is no ambiguity in the term "cost" in its statutory context.

The courts recognize that an "ambiguity" can properly be found only if there is a genuinely *reasonable* and *relevant* alternative reading of a term, not a merely *possible* or *arguable* alternative reading. Only this past Term, for instance, the Supreme Court found the meaning of the statutory phrase "person entitled to compensation" to be "plain," *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 478 (1992), despite the dissenting Justices' argument that it could bear two distinct interpretations, *id.* at 500-02 (Blackmun, J., dissenting). *See also United States v. James,* 478 U.S. 597 (1986) (holding that the provision of the Flood Control Act creating immunity for "damage" was not ambiguous even though that term might arguably refer only to damage to property rather than, as ordinarily understood, to damage to both persons and property).

*Helvering v. San Joaquin Fruit & Inv. Co.*, 297 U.S. 496, 499 (1936) ("Language used in tax statutes should be read in the ordinary and natural sense.").[7] Therefore, in order to determine whether "cost" is an ambiguous statutory term, we must first attempt to ascertain the "ordinary, contemporary, common meaning" of that term.

"Cost" first appears in the federal tax laws in the capital gains context in the Revenue Act of 1918.[8] The Supreme Court has explained that statutory terms are best understood by reference to meanings common at the time of their adoption. *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617 (1987).[9] Dictionaries that are roughly contemporaneous with the enactment of that Act define "cost" as the price paid for a thing or service. *See, e.g., Webster's New International Dictionary of the English Language* 509 (1917) (*"The amount or equivalent paid*, or given, or charged, or engaged to be paid or given for anything bought or taken in barter or service rendered . . . .") (emphasis added); 1 *Bouvier Law Dictionary* 689 (8th ed. 1914) ("The cost of an article purchased for exportation is the price paid, with all incidental charges paid at the place of exportation. Cost price is that actually paid for goods.") (citations omitted); 2 *A New English Dictionary on Historical Principles* 1034 (James A.H. Murray ed., New York, MacMillan & Co. 1893) ("That which must be given or surrendered in order to acquire, produce, accomplish, or maintain something; *the price paid for a thing*.") (emphasis added). More recent dictionaries give the same definition. *See, e.g., American Heritage Dictionary* 301 (1976) ("An amount paid or required in payment for a purchase."); *Black's Law Dictionary* 345 (6th ed. 1990) ("Expense;

---

[7] In *United States v. Leslie Salt Co.*, 350 U.S. 383 (1956), the Supreme Court unanimously rejected Treasury's "more recent ad hoc contention" as to how the statutory term "debenture" should be construed, in favor of Treasury's "prior longstanding and consistent administrative interpretation." *Id.* at 396. Treasury's traditional interpretation, the Court held, was more "in accord with *the generally understood meaning* of the term 'debentures.' 'The words of the statute [a stamp tax statute] are to be taken in the sense in which they will be understood by *that public in which they are to take effect.*'" *Id.* at 397 (citations omitted; emphases added; brackets in original).

[8] The Revenue Act of 1918 was actually enacted into law early in 1919. It provided in part: "That for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, . . . the basis shall be . . . the cost thereof." Act of Feb. 24, 1919, ch. 18, § 202(a)(2), 40 Stat. 1057, 1060.

Subsequent revenue acts, *see infra* note 16, adopted the formulation in effect today: in general, the basis of property is "the cost of such property." In 1939, Congress began the practice of codifying the tax laws. The definition of property's basis as generally "the cost of such property" appears unchanged in all three codifications. *See* Internal Revenue Code of 1939, ch. 2, § 113(a), 53 Stat. 1, 40; Internal Revenue Code of 1954, ch. 736, § 1012, 68A Stat. 1, 296 (codified at I.R.C. § 1012); Internal Revenue Code of 1986, Pub. L. No. 99-514, § 2, 100 Stat. 2085, 2095 (reenacting in relevant part the Internal Revenue Code of 1954).

[9] *See also Molzof v. United States*, 502 U.S. 301, 307 (1992) (relying upon "[l]egal dictionaries in existence when the [Federal Tort Claims Act] was drafted and enacted" to ascertain the meaning of a term used in that statute). Thus, although the meaning of the term "cost" has not changed in the 74 years since the enactment of the Revenue Act of 1918, we refer to authority contemporaneous with the first appearance of "cost" in this context.

Indeed, the definition of "cost" has remained essentially unchanged since the publication of the first modern English dictionary in 1755. In that year, Dr. Johnson defined "cost" principally as "[t]he price of any thing." 1 Samuel Johnson, *A Dictionary of the English Language (1755)* (Georg Olms Verlagsbuchhandlung ed. 1968).

price. The sum or equivalent expended, paid or charged for something."). Indeed, the only dictionary cited in the NCF Memorandum also gives as the primary meaning of cost "the price paid to acquire, produce, accomplish, or maintain anything." NCF Memorandum at 24 (quoting *Random House Dictionary of the English Language* 457 (2d ed. 1987)).

The NCF Memorandum's analysis of this dictionary meaning is revealing. The Memorandum first quotes the full definition: "1) the price paid to acquire, produce, accomplish, or maintain anything . . . , 2) an outlay or expenditure of money, time, labor, trouble, etc.: What will the cost be to me?, 3) a sacrifice, loss or penalty: to work at the cost of one's health." NFC Memorandum at 24. It then ignores the primary definition of cost — "price paid" — in favor of the third, obviously figurative, definition of cost as "loss" or "sacrifice."[10] *Id.* To this, the Memorandum adds "expenditure" generally, rather than "expenditure of money," which is the relevant concept when one is discussing the acquisition of property. The NCF Memorandum thus takes a perfectly clear definition of cost as applied to financial matters — price paid, or outlay or expenditure of money — and, without any discussion or further mention of that clear definition, seeks to obfuscate it.[11]

The NCF Memorandum attempts to mix the figurative and literal meanings of "cost" by asserting that "[a]ny such 'loss,' 'sacrifice,' or 'expenditure' needs to be ascribed a monetary value in order to determine the [taxable] gain realized" on the sale of an asset. *Id.* The Memorandum further asserts that the monetary value of a loss, sacrifice, or expenditure could be measured at other than the time it is incurred — at either the time of purchase or the time of sale. The Memorandum concludes: "We can discern nothing in the standard definition of 'cost' . . . suggesting that the historical 'purchase price' measurement of monetary value must be used in preference to a measurement that coincides with the sale of the asset." *Id.* Finally, the Memorandum asserts that when cost to the taxpayer is measured at the time of sale, it is legally appropriate to state cost in inflation-adjusted dollars to reflect the real impact of the purchase and sale on the taxpayer's buying power. *Id.* at 25.

We disagree with this line of reasoning on several levels. First, as reflected in each of the dictionary definitions of "cost" set forth above, the

---

[10] Moreover, after describing the third alternative dictionary definition of "cost" as "*a* standard definition," the NCF Memorandum suggests later on the same page that it is "*the*" standard definition, implying that the third definition is the *only* meaning of the term. NCF Memorandum at 24 (emphases added). Thus, the *primary* dictionary definition of "cost" is spirited away.

[11] The analysis set forth in the NCF Memorandum stands in marked contrast to the analysis employed by the Supreme Court in similar circumstances. In *Mallard v. United States District Court,* the Court was called on to interpret the word "request." The Court first looked to "closest synonyms" in "everyday speech," namely, "ask," "petition," and "entreat." 490 U.S. at 301 (citing *Webster's New International Dictionary* 1929 (3d ed. 1981) and *Black's Law Dictionary* 1172 (5th ed. 1979)). Although the Court acknowledged that the dictionary gave other entries — "require" and "demand" — it found "little reason to think that Congress did not intend 'request' to bear its *most* common meaning when it used the word in [the statute]." *Id.* (emphasis added). Indeed, despite the potential alternate meanings of request, the Court chose to give it "its ordinary and natural signification." *Id.; accord Perrin,* 444 U.S. at 42.

142

first and most common meaning of the term is the price paid. "Price paid" obviously *does* suggest an "historical 'purchase price' measurement of monetary value." The primacy of this meaning is easily illustrated. If one were asked "How much did your car cost?" a response simply that "the car cost $10,000" would be considered truthful only if that amount were at least a close approximation of the actual price paid at the time of purchase. In contrast, a response based on some specialized meaning of the term "cost" (such as cost expressed in inflation-adjusted dollars or net of trade-in value) would be perceived as not responsive to the question. Indeed, such a response would be viewed as truthful only if the respondent were careful to point out that he was using the term in other than its normal and plain meaning. Clearly, then, a specialized use of "cost" is appropriate only with the addition of some qualifying words signaling that the speaker is using the term in a manner not contemplated by normal usage.[12]

Second, even assuming that it is appropriate to look to an alternative, figurative definition to establish the ambiguity of a statutory term, the NCF Memorandum's argument on this point cuts sharply against its conclusion. When monetary values are ascribed to terms such as "sacrifice" and "loss," such values are normally measured when *made* or *expended*. For example, statements such as "I lost $5,000 on the stock market" and "I sacrificed $10,000 to help my neighbor" require the listener to assume that the speaker is talking about historical dollar "loss" or "sacrifice," unless the speaker makes clear that those terms are being used in some way other than their ordinary meaning.[13]

Finally, even if the definitions of the term "cost" could be read to create some ambiguity with respect to that term, the NCF Memorandum fails to demonstrate the existence of any *relevant* ambiguity. That a particular term has two plausible definitions does not support an agency determination that rests on a third implausible definition. As shown above, none of the dictionary definitions of "cost" refers to "purchase price adjusted for inflation."[14]

---

[12] An additional analytical flaw in the NCF Memorandum's treatment of the definition of the term "cost" is its focus on the "cost to the taxpayer" rather than on the statutory phrase "cost of such property" in section 1012 of the Code. The former phrase may be read to include a broader range of costs incurred by the owner in the course of ownership. For example, a statement of the "cost *to X* of owning a car" might include, in addition to the purchase price, costs associated with maintenance of the car, insurance, taxes, etc. The statute however, refers to "cost *of . . . property*." This phrase refers more naturally to the original price paid for the property: "What *did* the car cost?"

[13] Other relevant statutory terms also provide support for our rejection of the NCF Memorandum's conclusion that "cost" as used in section 1012 may be read to refer to something other than "historical cost." In ordinary usage, the term "gain" would be thought to describe an increase measured from one point in time to another. Moreover, the term "basis" suggests that gain is measured from some fixed baseline, rather than from a floating indicator of relative value.

[14] A possible alternative argument not advanced in the NCF Memorandum would be that, although the unambiguous meaning of "cost" is the original price paid, that definition is itself ambiguous in that it is not specified whether the price is to be stated in nominal or inflation-adjusted dollars. This argument suffers from several of the same defects noted above with respect to the Memorandum's attempt to discover ambiguity in the word "cost." The common meaning of the term "price" requires that it be stated in nominal dollars unless it is clear that the word is being used in some specialized sense. For example, in everyday speech the question "What was the price of your home when you bought it?" calls for an answer expressed in nominal dollars.

In addition to its argument based on the *Random House Dictionary*, the NCF Memorandum argues that "standard economic analysis" should be taken into account in determining the meaning of the term "cost." *Id.* at 25. To this end, the Memorandum looks to uses of "cost" in economics treatises to establish the term's ambiguity. *Id.* For purposes of construing section 1012 of the Code, however, the meaning to be given "cost" must be the "common and ordinary" meaning of that word — not its purported meaning in the jargon of economists. For example, the Tax Court has rejected arguments that taxpayers should not be taxed on their nominal capital gain, but on their "economic gain," quoting Learned Hand's statement that "'[the] meaning [of income] is to be gathered from the implicit assumptions of its use in common speech.' Thus, the meaning of income is not to be construed as an economist might, but as a layperson might." *Hellermann v. Commissioner*, 77 T.C. 1361, 1366 (1981) (quoting *United States v. Oregon-Wash. R.R. & Nav. Co.*, 251 F. 211, 212 (2d Cir. 1918)). In other words, "[t]he income tax laws do not profess to embody perfect economic theory." *Weiss v. Wiener*, 279 U.S. 333, 335 (1929). We must therefore reject the NCF Memorandum's attempt to ascertain the meaning of cost under "standard economic analysis," as well as its repeated invocations of "economic reality" or "principles" of sophisticated economic analysis more generally, *see, e.g., id.* at 2, 8, 23-27, 68, 87, 88 n.47, in favor of the common and ordinary meaning of that term.[15]

B.

The drafters of the Revenue Act of 1918 had available, in addition to the common and ordinary dictionary meanings of cost, Treasury's contemporaneous regulatory definition of cost. This definition, embodied in published Treasury Decisions, was "actual price paid." *See* T.D. 2005, 16 Treas. Dec. Int. Rev. 111, 112 (1914), *restated*, T.D. 2090, 16 Treas. Dec. Int. Rev. 259, 272-73 (1914). This definition, adopted by Congress in the 1918 Act, certainly also evidences the "ordinary, contemporary, common meaning" of cost.[16]

---

[15] The NCF Memorandum's contention that income from the sale of a capital asset can be determined for purpose of the Code only by taking inflation into account is similar to the legion of "tax protestor" claims that has so often been rejected by the courts. For example, in *Stelly v. Commissioner*, 804 F.2d 868, 869 (5th Cir. 1986), *cert. denied*, 480 U.S. 907 (1987), the taxpayers asserted that they were entitled to a 13 percent downward adjustment in their interest income on the ground that their interest income had been devalued by inflation The Fifth Circuit ruled that there was "no basis in law or fact" for the inflation adjustment and concluded that Treasury "properly characterized the [taxpayers'] argument as frivolous." *Id.* at 870.

[16] The assertion in the NCF Memorandum that "there is nothing in the legislative history of the 1918 Act indicating that these Treasury Decisions were being adopted," *id.* at 36, is incorrect. As discussed more fully below, the available legislative history from 1918 concerning this issue indicates that Congress did adopt Treasury's interpretation when it wrote "cost" into the Revenue Act of 1918. During the floor debate concerning a proposal to amend the 1918 legislation so as to virtually eliminate the effect of inflation on capital gains, it was explained that the capital gains provision of the Act was "merely enacting into law the *rules and regulations* now in force under the present statute." 56 Cong. Rec. 10,349 (1918) (statement of Rep. Garner) (emphasis added). *See also* Treasury Memorandum at 8-13.
    Treasury's interpretation of "cost" has not substantially changed since 1914. *See* 26 C.F.R. §

Continued

144

That "cost" in the Code has this plain meaning has been recognized in several court cases. For example, the Tax Court has stated that "there is no statutory provision which allows for an upward adjustment to basis to reflect inflation or loss of the purchasing power of the dollar." *Ruben v. Commissioner*, 53 T.C.M. (CCH) 992, 994-95 (1987). The court also observed that "[s]ections 1011 and 1012 of the Internal Revenue Code provide the general rule that a taxpayer's basis in property shall be its cost. While it is true that such [government] reports do provide evidence of inflation, basis in property is not affected by inflation." *Id.* at 994 n.2.[17]

Similarly, in *Crossland v. Commissioner*, 35 T.C.M. (CCH) 262 (1976), the taxpayers claimed an "inflation loss deduction" of ten percent of their gross income. The court acknowledged that "[i]nflation is a fact" and that it "affects every taxpayer to some extent," but it nonetheless disallowed the deduction: "Our tax structure is not set up to take into account the effects of inflation. Tax liability depends on income figures computed in terms of nominal dollars, without regard for inflation." *Id.* at 262. In a passage that is especially relevant, the court noted: "The problem of inflation has caused several writers to explore the practicality of indexing; *i.e.*, changing the tax structure to adjust for price level changes in computing taxable income. Although the suggestion might have merit, Congress has not seen fit to consider it . . . ." *Id.* at 263 (footnote omitted).[18]

---

[16] (....continued)

1.1012-1(a) ("The cost [of property] is the amount paid for such property in cash or other property."). This definition was adopted in T.D. 6265, § 1.1012-1(a), 1957-2, 12 C.B. 463, 470, and has not been amended. Congress has repeatedly amended and reenacted the tax laws and has never disturbed Treasury's consistent interpretation of cost. *See* Revenue Act of 1921, ch. 136, § 202(a), 42 Stat. 227, 229; Revenue Act of 1924, ch. 234, § 204(a), 43 Stat. 253, 258; Revenue Act of 1926, ch. 27, § 204(a), 44 Stat. 9, 14; Revenue Act of 1928, ch. 852, § 113(a), 45 Stat. 791, 818; Revenue Act of 1932, ch. 209, § 113(a), 47 Stat. 169, 198; Revenue Act of 1934, ch. 277, § 113(a) 48 Stat. 680, 706; Revenue Act of 1936, ch. 690, § 113(a), 49 Stat. 1648, 1682; Revenue Act of 1938, ch. 289, § 113(a), 52 Stat. 447, 490; Internal Revenue Code of 1939, ch. 2, § 113(a), 53 Stat. 1, 40; Internal Revenue Code of 1954, ch. 736, § 1012, 68A Stat. 1, 296 (codified at I.R.C. § 1012); Internal Revenue Code of 1986, Pub. L. No. 99-514, § 2, 100 Stat. 2085, 2095 (reenacting in relevant part the Internal Revenue Code of 1954).

A court would likely deem significant Congress's repeated reenactment of the tax laws without disturbing Treasury's interpretation of "cost." *Cottage Savings*, 499 U.S. at 560-62. *Accord United States v. Correll*, 389 U.S. 299, 305-06 (1967); *Helvering v. Winmill*, 305 U.S. 79, 83 (1938). A court would also likely attach significance to Congress's repeated consideration of and refusal to enact proposals explicitly to index capital gains for inflation. *See, e.g., Bob Jones Univ. v. United States*, 461 U.S. 574, 600-01 & n.25 (1983) (finding in Congress's failure to enact any one of thirteen bills introduced to overturn the Treasury's interpretation of section 501(c)(3) of the Code additional support for the conclusion that Congress acquiesced in that interpretation). For a recounting of these refusals, see *infra* note 27.

[17] This key case is discussed by the NCF Memorandum only in a footnote, at the end of a string cite, and the Tax Court's quoted conclusion is mischaracterized as the court's "refus[al], in the absence of clear statutory provisions to the contrary, to accept the taxpayer's construction of the [Internal Revenue Code] over the Treasury's contrary construction." NCF Memorandum at 70 n.39. As noted in the text, however, the *Ruben* court's conclusion rested expressly on its observation that there is no applicable "*statutory* provision" permitting an upward adjustment to basis to reflect inflation. The *Ruben* court viewed the taxpayers' argument to the contrary as so "frivolous" that it upheld the assessment of penalties against the taxpayers in the form of additional tax. 53 T.C.M. (CCH) at 996.

[18] The same footnote in the NCF Memorandum that mischaracterizes *Ruben* mischaracterizes *Crossland* in the same way. The footnote also cites two other Tax Court cases. Neither of these cases turns upon

Continued

Other courts have also interpreted the term "cost" as meaning nominal purchase price. In *Vandenberge v. Commissioner*, 147 F.2d 167, 168 (5th Cir.), *cert. denied*, 325 U.S. 875 (1945), the court stated: "Section 113(a) of the Revenue Act of 1938 provides that the unadjusted basis of property shall be the cost of such property. The solution to the question raised is as simple and clear as the language of the pivotal statute. The cost of the property was the price paid to acquire it." *See also Hawke v. Commissioner*, 35 B.T.A. 784, 789 (1937) ("We must assume that Congress used the term 'cost' in its commonly understood meaning as the amount of money which a man pays out in the acquisition of property."), *rev'd on other grounds*, 109 F.2d 946 (9th Cir.), *cert. denied*, 311 U.S. 657 (1940).

### C.

Another of the traditional tools of statutory construction is an examination of "the language and design of the statute as a whole." *K Mart Corp.*, 486 U.S. at 291. The NCF Memorandum appears to recognize this rule of construction, but asserts flatly that there is nothing "in any other language of the [Code] suggesting that the historical 'purchase price' measurement of monetary value must be used in preference to a measurement that coincides with the sale of the asset." *Id.* at 24. That assertion is mistaken. Many provisions of the Code that grant itemized deductions to individuals and corporations are intelligible only if "cost" under section 1012 is measured at the time an asset is purchased or at other times beside the time of sale.

To cite an important example, the deduction for depreciation is calculated based on "the adjusted basis provided in section 1011, for the purpose of determining the gain on the sale or other disposition of such property." I.R.C. § 167(c). Under section 1011, of course, the adjusted basis of an asset is determined by section 1012, which uses the term "cost." Accordingly, the cost of an asset must be known in every year in which the taxpayer would take a depreciation deduction. If Treasury reinterpreted cost to require that cost be measured at the time of the asset's sale, as the NCF Memorandum suggests it could, the taxpayer (and Treasury) would have no basis on which to calculate the proper deduction. *See* Treasury Memorandum at 52-53.[19]

---

[18] (....continued)

"Treasury's . . . construction" of the Code, as the Memorandum asserts. *Gajewski v. Commissioner*, 67 T.C. 181 (1976), *aff'd*, 578 F.2d 1383 (8th Cir. 1978), held that the "the statutory gold content of the dollar is irrelevant for purposes of computing petitioner's taxable income *under the Code.*" *Id.* at 195 (footnote omitted; emphasis added) *Sibla v. Commissioner*, 68 T.C. 422 (1977), *aff'd*, 611 F.2d 1260 (9th Cir. 1980), held that the taxpayer was "not entitled to any adjustment in the gross income he received because of any decline in value of the dollar with respect to gold or silver." *Id.* at 431. Nothing in *Sibla* suggests that the holding was based on Treasury's interpretation of the Code, rather than on the court's own interpretation.

[19] Many other deductions and credits are also defined in terms of "adjusted basis" and would suffer from the same problem. *See* I.R.C. §§ 42(d) (low income housing), 165(b) (losses), 166(b) (bad debts), 169(f)(1) (pollution control facilities), 171(b)(2) (bond premiums), and 612 (depletion). If cost for some purposes must be determined at the time of acquisition, or at least at the time the deduction or credit is taken each year, while cost for purposes of calculating capital gains is to be determined at the time that an asset is sold (as proposed by the NCF Memorandum), the Internal Revenue Code would contradict itself. Such a forced contradiction would certainly undercut the reasonableness of any Treasury regulation indexing capital gains for inflation.

Other structural characteristics of the Code strongly support the conclusion that cost unambiguously means historical price paid, in nominal dollars *not* adjusted for inflation. As indicated above, "adjusted basis" is important in interpreting many provisions of the Code. The term appears in more than a hundred sections. By reference to section 1012, section 1011 provides that adjusted basis is generally the cost of property, "adjusted as provided in section 1016." I.R.C. § 1011(a). Section 1016 is entitled "Adjustments to basis," and it contains twenty-five separate items of adjustment.[20] This list of congressionally determined adjustments to cost does not include an inflation adjustment. Yet one would rationally expect that if Congress intended to provide such an adjustment in the Code, the adjustment would appear in section 1016 or in some other section of Part II of Subchapter O, entitled "Basis Rules of General Application." It is, at best, unlikely that Congress would so carefully and precisely lay out the many mandatory and allowable adjustments to cost and at the same time load (or authorize Treasury to load) a very significant adjustment — for inflation — into the word "cost" itself.

Moreover, under the doctrine of expressio unius est exclusio alterius ("the expression of one thing is the exclusion of another"), omissions in such instances are to be deemed to reflect the intent of the legislature. Thus, in *TVA v. Hill*, 437 U.S. 153 (1978), the Court ruled that TVA's Tellico Dam project was subject to Endangered Species Act requirements, reasoning that, while Congress had included several "hardship" exemptions in the Act, none was provided for federal agencies. The Court concluded that "under the maxim expressio unius est exclusio alterius, we must presume that these were the only 'hardship cases' Congress intended to exempt." *Id.* at 188. *See also, e.g., United States v. Monsanto*, 491 U.S. 600, 611 (1989) (inclusion of forfeiture exemption in another chapter of the same legislation "indicates . . . that Congress understood what it was doing in omitting such an exemption" from the chapter at issue); Letter for George U. Carneal, General Counsel, Federal Aviation Administration, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, at 2 (Oct. 6, 1971); 2A Norman J. Singer, *Sutherland on Statutory Construction* § 47.23, at 216-17 (5th ed. 1992). Because Congress has specified other adjustments to basis but has not included an adjustment for inflation in the computation of capital gains, it follows that Congress did not intend to permit indexing in the capital gains context.

The force of this argument is even greater because Congress has, elsewhere in the Code, carefully and precisely set forth a number of adjustments for inflation. Section 1(f), entitled "Adjustments in tax tables so that inflation will not result in tax increases," requires Treasury every calendar year to "increas[e] the minimum and maximum dollar amounts for each rate bracket . . . by the cost-of-living adjustment for such calendar year," which

---

[20] Twenty-three of these are found in subsection (a)(1)-(9), (11)-(24), and one each in subsections (c) and (d).

adjustment is defined by reference to the Labor Department's published Consumer Price Index for all-urban consumers. I.R.C. § 1(f)(2)(A), (3)-(5). At least eight other dollar amounts specified in the Code are indexed for inflation by reference to section 1(f)(3). *Id.* §§ 32(i) (earned income credit), 41(e)(5)(C) (research activity credit), 42(h)(6)(G) (low income housing credit), 63(c)(4) (standard deduction), 68(b)(2) (overall limitation on itemized deductions), 135(b)(2)(B) (income from U.S. savings bonds used to pay higher education tuition and fees), 151(d)(4) (personal exemptions), and 513(h)(2)(C) (distributions of low cost articles by tax-exempt organizations). Section 1012, of course, contains no comparable provision. Again, we would expect that if Congress intended that asset costs be indexed for the calculation of capital gains, it would have done so explicitly and in the same manner as these many other indexing provisions.[21]

## D.

In an attempt to find some basis in the statute to support its proposed interpretation, the NCF Memorandum relies on the writings of certain tax theorists for the proposition that a general purpose of the tax code is to treat similarly situated taxpayers alike (the principle of "horizontal equity"). *Id.* at 8, 26. From this general purpose, the Memorandum argues that the term "cost" should be read to mean inflation-adjusted cost in order to avoid the inequity inherent in taxing real and inflationary gains at the same rate.

Although the principle of horizontal equity may be embodied as a general purpose of the Code, that general purpose cannot be taken to provide a statutory basis for indexing of capital gains. The Supreme Court has noted the dangers of attempting to argue from a general statutory purpose to a context-specific interpretation of a particular statutory provision:

---

[21] We note that the NCF Memorandum nowhere discusses the significance of section 1(f) of the Code and the provisions that refer to it, even though it is clearly of legal significance that Congress has provided for inflation-related indexation in some instances, but not in the case of capital gains. The NCF Memorandum attempts to explain away congressional failure to index asset costs in the same manner as tax brackets and other concepts in part because "the adverse effect of inflation was ameliorated by the general capital gains tax preference" (a lower effective tax rate on capital gains), which "obviated the need and impetus, from 1921 until 1986, to establish a more accurate counter for inflation, such as indexation." *Id.* at 53.

The argument, in fact, cuts against the NCF Memorandum's conclusions. Accepting the argument on its face, it is obvious that to the extent Congress established a preference for capital gains in order to reduce taxation of gains that resulted merely from inflation, Congress assumed that its tax laws otherwise treated cost as nominal purchase price with no adjustment for inflation. Moreover, as your opinion points out, Congress has consistently recognized that inflation introduces distortions into the calculation of capital gains. Treasury Memorandum at 13-15. It appears, then, that Congress has consistently made a deliberate policy choice not to index asset basis for inflation. As for the decision to repeal the capital gains preference in 1986, it was not taken in ignorance of the special character of investment in capital assets, but with a conscious belief that the reduction in individual income tax rates would eliminate any need to accord preferential treatment to capital gains. *Id.* at 15. In any event, long-term capital gains now enjoy a slightly preferential rate. *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 11101(c), 104 Stat. 1388, 1388-404 to 1388-405 (amending I.R.C. § 1(j)).

[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice — and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

*Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). *See also Board of Governors v. Dimension Financial Corp.*, 474 U.S. 361, 373-74 (1986) (rejecting agency's use of the "plain purpose" of legislation to support regulatory definitions not supported by the plain language of the statute).

Even more generally, the NCF Memorandum suggests that the Court has deferred to agency interpretations of other terms that are "no more ambiguous than the terms at issue here." *Id.* at 22 n.11. This approach to statutory interpretation suffers from a glaring flaw: as the Supreme Court has recognized in determining whether deference is owed, the court "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp.*, 486 U.S. at 291. Accordingly, even an identical term may be ambiguous in one context and not in another. For example, in *Helvering v. Reynolds*, 313 U.S. 428 (1941) — relied upon in the NCF Memorandum for the proposition that "acquisition" was found to be ambiguous, *see id.* at 22 n.11 — the Court found the term ambiguous only in the context presented. The Court noted that although the same term might be "unambiguous . . . as respects other transactions," 313 U.S. at 433 (citing *Helvering v. San Joaquin Fruit & Inv. Co.*, 297 U.S. 496 (1936)), it was in fact ambiguous in the context of remainder interests passing by bequest, devise, or inheritance, *id.* In *San Joaquin*, on the other hand, the Court, addressing real property acquired by lease with an option to buy, relied on the "plain import" of the word "acquired," because "acquired" was not a term of art and "[l]anguage used in tax statutes should be read in the ordinary and natural sense." 297 U.S. at 499.

Moreover, the cases relied upon by the NCF Memorandum for this suggestion themselves rely on factors that, when applied to the present case, undercut the Memorandum's ultimate conclusions. The Memorandum's reliance in *Cottage Savings*, for example, appears to ignore the fact that the Court, addressing the reasonableness of the agency's interpretation, discussed at length the fact that the long-standing agency interpretation had been left undisturbed by Congress for many years, and stated that "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." *Cottage Savings*, 499 U.S. at 561. Here, as the NCF Memorandum recognizes, "Treasury's consistent and long-standing interpretation of cost" has been "original cost."

*Id.* at 77. *See also INS v. Cardoza-Fonseca,* 480 U.S. at 446 n.30 ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.") (quoting *Watt v. Alaska,* 451 U.S. 259, 273 (1981)).[22]

Finally, the NCF Memorandum cites two cases as support for the proposition that "'cost' or similar terms in *other* statutes have been construed to permit, or even require, taking account of inflationary effects." *Id.* at 27 (emphasis added). That proposition is, of course, largely irrelevant to understanding the intent of Congress in enacting the Internal Revenue Code. *See, e.g., Prussner v. United States,* 896 F.2d 218, 228 (7th Cir. 1990) (en banc) (pointing out that "[d]ifferent statutes passed by different Congresses often do use the same words to mean different things"). In any event, at least one of the two cited cases simply offers no support for the Memorandum's proposition. *Amusement & Music Operators Ass'n v. Copyright Royalty Tribunal,* 676 F.2d 1144 (7th Cir.), *cert. denied,* 459 U.S. 907 (1982), concerned a statute that required the Copyright Royalty Tribunal to determine "reasonable copyright royalty rates." 17 U.S.C. § 801(b)(1). The court noted that the Tribunal had rejected an "individualized cost-based approach" and instead relied on factors "not related to cost." 676 F.2d at 1148.[23]

Accordingly, we agree with your conclusion that the Internal Revenue Code's plain language and structure demonstrate that "cost" cannot be interpreted to allow an adjustment for inflation.

## III.

Under the Supreme Court's jurisprudence, the plain meaning of the word "cost" ends the inquiry:

> The task of resolving the dispute over the meaning of [the statute] begins where all such inquiries must begin: with the language of the statute itself. In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, "the sole function of the courts is to enforce it according to its terms." The language before us expresses Congress' intent . . . with sufficient precision so that reference to legislative history . . . is hardly necessary.

---

[22] The Court's recent decision in *Rust v. Sullivan,* 500 U.S. 173 (1991), which noted that an agency interpretation is entitled to some deference even if it represents a break with prior interpretations, *id.* at 186-88, did not alter this rule. Subsequent to *Rust,* the Court again stated the general rule that "the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views." *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 698 (1991).

[23] Indeed, the statute specifically *authorized* the Tribunal "to make determinations concerning the *adjustment* of reasonable copyright royalty rates." 17 U.S.C. § 801(b)(1) (emphasis added). Pursuant to that authority the Tribunal allowed an inflation adjustment in 1987. In *Chevron* terms, the adjustment was "affirmatively supported by the language of the Act." 676 F.2d at 1155. By contrast, in the case of section 1012 of the Internal Revenue Code, Congress has provided only the definition of "basis" in terms of "cost," while *omitting* any general grant of authority to make inflation-linked adjustments to cost basis.

150

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citations omitted). Once it is determined as a textual matter that cost means "actual price paid" in nominal dollars, resort to the legislative history is unnecessary.

As noted above, however, *Chevron* requires that the search for the meaning of a statutory provision be conducted by "employing traditional tools of statutory construction." 467 U.S. at 843 n.9. These tools include the legislative history of the provision. *See also Cardoza-Fonseca*, 480 U.S. at 449. Thus, even if we were to conclude that the plain language and the structure of the Code did not provide a clear meaning for the term "cost" in section 1012, we would be compelled to search the legislative record of the Revenue Act of 1918 to determine if that record could provide such meaning.[24] Based on our review of that record, we agree with your conclusion that "the contemporaneous legislative history of the [Act] indicates that Congress intended the word 'cost' to mean the price paid in nominal dollars not adjusted for inflation." Treasury Memorandum at 8 (capitalization omitted).

As we have noted above, Treasury's pre-1918 regulatory definition of cost was "actual price paid." T.D. 2005, 16 Treas. Dec. Int. Rev. 111, 112 (1914), *restated*, T.D. 2090, 16 Treas. Dec. Int. Rev. 259, 272-73 (1914). Contrary to the assertion in the NCF Memorandum that "there is nothing in the legislative history of the 1918 Act indicating that these Treasury Decisions were being adopted," *id.* at 36, the legislative history concerning this issue clearly indicates that Congress adopted Treasury's interpretation when it wrote "cost" into the Revenue Act of 1918. Indeed, it was explained during floor debate concerning an amendment proposed by Representative Hardy, intended in part to eliminate the effects of inflation on capital gains, that the capital gains provision of the Act was "merely *enacting into law the rules and regulations* now in force under the present statute." 56 Cong. Rec. 10,349 (1918) (statement of Rep. Garner) (emphasis added).

The NCF Memorandum, after extensively quoting from the debate surrounding Representative Hardy's proposed amendment to the capital gains provision of the Act, concedes that the legislative history "demonstrates that at least certain members of Congress were aware of the effects of inflation on capital gains. It also can be argued to reflect *an understanding of Congress that a property's basis referred to the acquisition cost of the property.*" *Id.* at 44 (emphasis added).

---

[24] The NCF Memorandum suggests that the proper scope and significance of legislative history is unclear under *Chevron*. *Id.* at 31 n.15. To the contrary, we believe its relevance is quite clear. A court undertakes a *Chevron* inquiry employing traditional tools of statutory construction, of which legislative history is generally one *See, e.g., Chevron*, 467 U.S. at 851-53, 862-64 (analyzing the legislative history of the Clean Air Act); *NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 124-25 (1987) (analyzing the history of the Labor Management Relations Act). *See also Wagner Seed Co. v. Bush*, 946 F.2d 918, 920 (D.C. Cir. 1991) (*Chevron* requires deference "when the statute, viewed in light of its legislative history and the traditional tools of statutory construction, is ambiguous."), *cert. denied*, 503 U.S. 970 (1992).

151

Indeed, Congress must have been extremely well aware of the problems of inflation when it adopted the Act. In 1918, the year prior to the first statutory use of "cost" to define basis in the capital gains context, consumer prices for all urban consumers increased by 18.0%. *Economic Indicators Handbook* 224 (Darney ed. 1992).[25] In the previous year, inflation was nearly as high, at 17.4%, a dramatic rise from the 1% inflation rates in 1914 and 1915. *Id.*

In view of this World War I-related inflation, it is not surprising that a proposal intended to eliminate most of the effects of inflation on capital gains was debated at the time. In moving to strike the basis provision out of the Revenue Act entirely, Representative Hardy argued that the tax on gains would be unfair because "a piece of property bought in 1913, if its exchange value today is to be equal to its exchange value when it was bought, must bring in dollars and cents something like two times what it cost." 56 Cong. Rec. at 10,349.[26] *See also id.* ("[If a] man today makes a sale of a tract of land which he bought in 1913 at the prices then prevailing, and if he sold it today at 100% apparent profit and reinvested the money he could not obtain any more property now than he could have obtained in 1913 with the money then paid for the same land.").

While noting that "the reasoning of [Representative Hardy] would apply to every conceivable source of income," not simply capital gains, *id.* at 10,350 (statement of Rep. Kitchin), opponents of the proposed amendment emphasized that the section dealing with capital gains did not change current law. *See id.* ("This provision makes absolutely no change in existing law.") (statement of Rep. Kitchin). The opponents also explained how current law operated. Representative Fordney thus stated that if a taxpayer purchased property ten years ago and then sold it, the appropriate measure of the gain would be "[t]he difference between the *price paid for it 10 years ago* and the price you sell it for today." *Id.* at 10,351 (emphasis added). Representative Kitchin, the Chairman of the House Ways and Means Committee, further explained that "[i]f you bought a ship in 1916 for $100,000 and sell it in 1918 at $200,000, or if you bought Bethlehem stock or United States Steel Corporation stock in 1915, your income is the difference between the purchase and selling price, and that is the only rule under which you can administer the law." *Id.* at 10,350-51. The hypotheticals posed by Representatives Fordney and Kitchin are particularly revealing since the gains described would, to a large degree, have been attributable to the dramatic wartime inflation described above. No one at the time disputed these characterizations of current law, and the statements were consistent with the earlier Treasury Decisions quoted above. Ultimately, Representative Hardy withdrew his proposal to strike the basis provision and proposed an amendment

---

[25] The 1918 Act was adopted in 1919. *See supra* note 8.

[26] Representative Hardy was half right. Consumer prices had increased slightly more than 50% from 1913 to 1918, from an index of 9.9 to an index of 15.1. *Economic Indicators Handbook* at 224.

that would measure capital gain only from the beginning of the year in which the capital asset was sold. *Id.* at 10,351, 10,354. Congress was apparently not persuaded to remedy the effects of inflation on income derived from capital gains in this way, and the proposal was rejected. *Id.*

The NCF Memorandum attempts to deny the force of its own reading of the legislative history by asserting that the 1918 Act's legislative history "simply does not speak directly and clearly to the 'precise question at issue.'" *Id.* at 46-47 (quoting *Chevron,* 467 U.S. at 843 n.9). For the reasons set forth above and in the Treasury Memorandum, we disagree. In any event, as the NCF Memorandum recognizes, the legislative history is consistent with the ordinary meaning of the term "cost" as meaning historical price paid, *id.* at 44, and clearly demonstrates that Congress legislated with full knowledge of the effect of current law and of the impact of inflation on capital gains.

For these reasons, we concur in your conclusion that the legislative record evidences a clear congressional intent that "cost" be given its common and ordinary meaning, that is, price paid in nominal dollars not adjusted for inflation. Treasury Memorandum at 8-13.

## IV.

The NCF Memorandum argues that Treasury's adoption of a capital gains indexing regulation is not foreclosed by Congress's repeated reenactments of the Internal Revenue Code with knowledge of Treasury's interpretation of "cost" to mean the actual price paid (the "reenactment" doctrine), or by Congress's rejection of statutory indexing proposals (the "acquiescence" doctrine). *See* NCF Memorandum at 75-87. We have discussed these doctrines only briefly, *see supra* note 16, because they have application only if Treasury has discretion under the statute to reinterpret "cost" — that is, only if "cost" is ambiguous. In Parts II and III, we have demonstrated that it is not.

In places, however, the NCF Memorandum appears to make an affirmative argument in support of regulatory indexing of capital gains based on recent votes of either the Senate or the House on legislative proposals to index capital gains:

> [W]hile Congress has not actually enacted a capital gains indexing proposal, the legislative history of Congress' consideration of such proposals reveals, if anything, that Congress *favors* the concept of indexing capital gains. Indeed, . . . indexation measures have *passed* in recent sessions of both the Senate and the House . . . .

> Congress' deliberations on the issue to date suggest that a majority of both Houses would welcome a Treasury reinterpretation of "cost" to take account of inflation.

153

NCF Memorandum at 84. *See also id.* at 3 ("[T]he legislative history of Congress' consideration of such proposals reveals, if anything, that Congress *favors* the concept of indexing capital gains."). This reasoning is substantially flawed for several reasons.

First, as the Treasury Memorandum points out, although Congress has repeatedly considered proposals explicitly to index capital gains for inflation, it has *never* enacted them. *Id.* at 15-18.[27] It is a strange twist of logic to conclude that because Congress has *rejected* a proposal many times, Congress therefore *favors* that proposal. Second, even assuming that a majority of both Houses would in fact be willing to enact such legislation, it by no means follows that they would welcome *an administrative agency's* decision to bring about a similar outcome by regulatory action alone.

More fundamentally, the attitude of a majority of the members of the current Congress is completely irrelevant to the question whether an agency's interpretation of existing law is or is not correct. Like the courts, the executive branch must interpret the law as it finds it, not base its interpretations on conjecture as to how Congress *might* act. Thus, although agencies must follow the "will of Congress" in interpreting statutes, "[t]he 'will of Congress' we look to is not a will evolving from Session to Session, but a will expressed and fixed in a particular enactment." *West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 n.7 (1991). Furthermore, it is an elementary principle of constitutional law that the policy preferences of individual members of Congress, even if they happen to comprise majorities of both Houses, are legally meaningless until they crystallize into "bicameral passage followed by presentment to the President." *INS v. Chadha*, 462 U.S. 919, 954-55 (1983). *See also* NCF Memorandum at 80 n.43.

The history of capital gains taxation also shows that Congress was aware of the effects of inflation but chose to deal with them in a manner other than indexation. The Revenue Act of 1918 did not distinguish between capital and ordinary income for purposes of tax rates. In 1921, however, Congress enacted the first preference for capital gains income. *Compare* Revenue Act of 1921, ch. 136, § 206(b), 42 Stat. 227, 233 (taxing capital gains at a maximum of 12.5%) *with id.*, § 211(a)(1), 42 Stat. at 233-35 (taxing ordinary income at rates as high as 65%). Your opinion concludes that "[o]ne of the policy reasons most often cited for this preferential treatment was the

---

[27] On at least four occasions since 1978, indexation legislation has been approved by either the Senate or the House, only to be rejected in conference. *See* Revenue Act of 1978, H.R. 13511, 95th Cong., 2d Sess. § 404 (1978) (approved by House), *rejected by* H.R. Conf. Rep. No. 1800, 95th Cong., 2d Sess. 258 (1978); Tax Equity and Fiscal Responsibility Act of 1982, H.R. 4961, 97th Cong., 2d Sess. § 310A (1982) (approved by Senate), *rejected by* H.R. Conf. Rep. No. 760, 97th Cong., 2d Sess. 478 (1982); Omnibus Budget Reconciliation Act of 1989, H.R. 3299, 101st Cong., 1st Sess. § 11961 (1989) (approved by House), *rejected by* H.R. Conf. Rep. No. 386, 101st Cong., 1st Sess. 664 (1989); Tax Fairness and Economic Growth Act of 1992, H.R. 4210, 102d Cong., 2d Sess. § 2101 (1992) (approved by House), *rejected by* H R. Conf. Rep. No. 461, 102d Cong., 2d Sess. 356, 364 (1992).

desire to mitigate the impact of inflation on the taxation of capital gains." Treasury Memorandum at 13. *See also id.* n.16 (citing committee hearings on the 1921 Act); NCF Memorandum at 48-49 & n.25 (same).

It is apparent that the draftsmen of the 1921 Act did not intend that "cost" reflect an adjustment for inflation. In reenacting the tax laws, they chose to mitigate the effects of inflation on capital assets by granting preferential treatment to capital gains — *not* by indexing cost. This choice reflects their understanding that without some special treatment, capital gains would be peculiarly subject to the effects of inflation under the tax laws. Congress's decision to provide preferential treatment for capital gains assumed that the Treasury's regulatory interpretation of "cost" as "actual price paid" was valid and would remain in effect.[28]

As recently as 1978, Congress was again faced with a choice in dealing with the impact of inflation on the values of capital assets. In the course of enacting the Revenue Act of 1978, the House adopted a provision expressly indexing the basis of such assets. The Senate, on the other hand, rejected this approach, choosing instead to increase the capital gains exclusion from 50% to 60%. The Finance Committee's explanation for this choice is instructive:

> [A]n increased capital gains deduction will tend to offset the effect of inflation by reducing the amount of gain which is subject to tax. Thus, by increasing the deduction, taxable gain should be reconciled more closely with real, rather than merely inflationary gain. However, since the deduction is constant, unlike the automatic adjustments generally provided for in various indexation proposals, it should not tend to exacerbate inflationary increases.

S. Rep. No. 1263, 95th Cong., 2d Sess. 192 (1978). The bill as finally enacted into law adopted the Senate's version. Pub. L. No. 95-600, § 402(a), 92 Stat. 2763, 2867 (1978).

Whenever Congress has been faced with a choice of different methods for dealing with the impact of inflation on capital gains, it has chosen some means other than indexation. Indeed, it has specifically rejected indexation in favor of the capital gains preference. This fact reflects both the understanding that indexation was not allowed under the Code in the first place and the intent of Congress to keep it that way. We believe that Congress's

---

[28] The capital gains preference continued to be a major feature of the tax laws until 1986. Since the enactment of the 1954 Code, this preference was accomplished in part by allowing individual taxpayers to exclude from gross income a substantial percentage of their capital gain income. *See, e.g.,* 26 U.S.C. § 1202 (1982) (allowing individuals to deduct 60% of their net capital gain from gross income). Section 1202 was repealed in 1986. Pub. L. No. 99-514, § 301(a), 100 Stat. 2085, 2216 (1986).

continued affirmation of an inflation-mitigating mechanism other than index-ation — specifically, preferential treatment — together with Treasury's consistent interpretation of "cost" as not allowing indexation, makes this a particularly compelling case for concluding that Congress has ratified Treasury's interpretation of the Code.[29]

## V.

The NCF Memorandum advances two other arguments, both of which are unavailing. First, the Memorandum attempts to show that "the Treasury has historically taken a flexible view toward its own interpretation of basis and cost." *Id.* at 29. Yet the supposed instances of this "flexible" view are mischaracterized.

The NCF Memorandum claims that because the 1918 Treasury regula-tions addressing the capital gains treatment of property acquired by gift equated "cost" with fair market value of the property at the time of the gift, cost "was completely divorced from concepts of historical or original cost." *Id.* at 38. This is mistaken; cost was clearly tied to the fair market value *at the time the asset was acquired by gift or bequest.* Rather than altering the time at which cost is calculated, as the Memorandum argues, the regulations merely substituted an appropriate measure of value where the taxpayer in question had not paid anything for the asset. *See Hartley v. Commissioner,* 295 U.S. 216, 219 (1935) ("The use of the word cost does not preclude the computation and assessment of the taxable gains on the basis of the value of property [at the time of acquisition] rather than its cost, where there is no purchase by the taxpayer, and thus no cost at the controlling date.").[30] Simi-larly, although Congress subsequently rejected fair market value at the time of the gift in favor of the donor's original cost, *see* Revenue Act of 1921, ch. 136, § 202(a)(2), 42 Stat. 227, 229, Congress never deviated from tying the basis to original cost — the only question was *whose* original cost was appropriate.

The NCF Memorandum also cites the treatment of depreciation and deple-tion in the 1918 regulations as an example of Treasury's flexibility in defining cost. *Id.* at 40. Those regulations, however, reflected flexibility not in defining "cost" but in determining what "property" the taxpayer owned. When those regulations were challenged in *United States v. Ludey,* 274 U.S. 295

---

[29] There is evidence that when Congress eliminated the capital gains preference in 1986, its decision not to replace the preference with indexation was deliberate. As the NCF Memorandum points out, both the Treasury's public tax proposals in 1984 and the President's proposals to the Congress in 1985 recom-mended some form of indexation *Id.* at 57-58. Moreover, the problem of inflation and the need to index capital gains in the absence of preferential treatment were the subject of congressional hearings. *See, e.g., Tax Reform Act of 1986, Part IV: Hearings Before the Senate Comm. on Finance,* 99th Cong., 2d Sess. 61 (1986).

[30] In any event, to reason from the treatment of gifts in 1918 that the indexation of capital gains is appropriate, the NCF Memorandum would have to demonstrate the legal propriety of indexing the value of a gift from the date its cost is determined. There is no suggestion that such an adjustment would have been permissible.

156

(1927), the Supreme Court observed that the depreciation allowance was based on the theory that "by using up the [property], a gradual sale is made of it," and. thus "[t]he depreciation charged is the measure of the cost of the part which has been sold." *Id.* at 301. *See also id.* at 302 (depletion charge "represents the reduction in the mineral contents of the reserves from which the product is taken"). The Court never deviated from its treatment of cost as a bearing on the price paid: "[t]he amount of the depreciation must be deducted from the *original cost* of the whole [property] in order to determine the cost of that disposed of in the final sale of properties." *Id.* at 301 (emphasis added). *See also* Treasury Memorandum at 30 n.30. The NCF Memorandum concedes as much: "the regulations provided that the *original cost* of property had to be adjusted downward for any depreciation or depletion taken on the property by the taxpayer prior to its sale." *Id.* at 40 (emphasis added). Nothing in the regulations suggested that the starting point for this calculation was not original cost in nominal dollars.

Second, the NCF Memorandum reads *Ludey* as upholding "the Treasury's discretion to fill in gaps left by Congress in the [Code's] capital gains provisions, specifically in the concept of 'cost.'" NCF Memorandum at 66. That reading is flawed in several respects. First, the *Ludey* Court did not rely on the Commissioner's regulatory interpretation; it instead held that "the *revenue acts* should be construed as *requiring* deductions for both depreciation and depletion when determining the original cost of oil properties sold." 274 U.S. at 300 (emphasis added). By its own terms, therefore, *Ludey* is not a decision that upholds agency discretion, but a decision in which the Court construed the statute for itself. *See also id.* at 303-04 (rejecting the Commissioner's method for determining the appropriate deduction).

The Treasury regulations in question in *Ludey* did not fill in "gaps" in the statutory term "cost;" rather, they reconciled two potentially contradictory statutory provisions. Treasury's interpretation of "cost" as requiring adjustments for depreciation was necessary to harmonize the statutory provision taxing capital gains with the statutory provision granting annual deductions for depreciation — that is, to prevent taxpayers from receiving tax benefits twice. *See id.* at 301 ("Any other construction would permit a double deduction for the loss of the same capital assets."). The Court avoided this double deduction based on indications in the statute that no such deduction was intended.[31] For example, the Court noted that Congress intended the allowance for depreciation to reflect a "gradual sale" of the property. Thus, the "depreciation charged is the measure of *the cost of the part which has been sold.*" *Id.* at 301 (emphasis added). Similarly, the Court determined that because depletion allowances were limited by statute to the amount of the

---

[31] *Cf. United States v. Skelly Oil Co.*, 394 U.S. 678, 695 (1969) (Stewart, J., dissenting) ("In prior decisions [including *Ludey*] disallowing what truly were 'double deductions,' the Court has relied on evident statutory indications, not just its own view of the equities, that Congress intended to preclude the second deduction.").

capital invested, the deduction was meant "to be regarded as a return of capital, not as a special bonus for enterprise and willingness to assume risks." *Id.* at 303.

In the case of indexing for purposes of determining capital gain, there is no conflict in statutory provisions that indexing would resolve. Indeed, as explained above, any interpretation that measures cost at the time of sale rather than purchase would create a positive conflict with provisions allowing deductions for depreciation and other items.

## VI.

For all the reasons set forth above, we conclude, as did the Treasury Department, that the term "cost" as used in section 1012 is not ambiguous.[32]

TIMOTHY E. FLANIGAN
*Assistant Attorney General*
*Office of Legal Counsel*

---

[32] Because we conclude that in using the term "cost," Congress has left no "gap" for Treasury to fill, no further inquiry is appropriate. We need not address under step two of *Chevron* whether a proposed Treasury regulation indexing capital gains for inflation would be a "reasonable" interpretation of section 1012 of the Code. 467 U.S. at 844.