Filed 5/27/22

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE COMMUNITY ACTION AGENCY OF BUTTE COUNTY, <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF BUTTE COUNTY, <br><br> Respondent; <br><br> LYNNE BUSSEY et al., <br><br> Real Parties in Interest. | C093020 <br><br> (Super. Ct. No. 19CV02159) |

ORIGINAL PROCEEDING in mandate. Stay issued. Petition granted. Tamara L. Mosbarger, Judge.

Diepenbrock Elkin Dauer McCandless and Jennifer L. Dauer for Petitioner.

Caufield & James and Santino M. Tropea for California Community Action Partnership Association as amicus curiae on behalf of Petitioner.

Alcorn Law Corporation, Mark Alcorn and Molly Alcorn for California Community Economic Development Association, California Association of Food Banks, and the California Association of Nonprofits as amici curiae on behalf of Petitioner.

No appearance for Respondent.

Paul Nicholas Boylan for Real Party in Interest Lynn Bussey.

Xavier Becerra, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown and Kevin L. Quade, Deputy Attorneys General, for Real Party in Interest Department of Community Service and Development.

In this writ proceeding, we consider whether petitioner, The Community Action Agency of Butte County (CAA), must produce its business records pursuant to the California Public Records Act (CPRA), the Freedom of Information Act (FOIA), and/or a regulation promulgated by real party in interest, California's Department of Community Services and Development (the Department).

After concluding CAA was subject to both FOIA and CPRA as an "other local public agency" within the meaning of Government Code section 6252, subdivision (a)[1] (which defines a "local agency" for CPRA purposes) respondent superior court ordered CAA to produce records that real party in interest Lynne Bussey requested from CAA. CAA filed a petition for writ of mandate in this court, seeking review of the superior court's order.

After considering the arguments presented (including those of amici curiae The California Community Action Partnership Association and The California Community Economic Development Association, et al.), the text and history of CPRA, and other applicable authorities, we conclude: (a) a nonprofit entity like CAA may be an "other local public agency" only in exceptional circumstances not present here; (b) under a four-

---

[1] Further undesignated statutory references are to the Government Code.

factor test we adopt based on persuasive out-of-state authority, there is not substantial evidence for the trial court's ruling that CAA is an "other local public agency"; (c) FOIA does not apply to CAA; and (d) the Department's regulation does not require CAA to provide public access to its records generally.[2]

Accordingly, we vacate the trial court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2019, Bussey requested from CAA "access to and copies of" 14 categories of records, including "check registers from 2012-2017," "credit card statements, 2012-2017," and "[r]ecords documenting CAA reimbursements to" its chief executive officer "for travel expenses . . . from 2012-2017." CAA declined Bussey's

---

[2] Bussey contends CAA's writ petition in this court failed to comply with the California Rules of Court requiring (i) submission of reporter's transcripts of oral proceedings or (ii) a declaration explaining why transcripts are unavailable and fairly summarizing the proceedings, and therefore should be "summarily denied." (Cal. Rules of Court, rule 8.486(b)(1)(D), (b)(3).) Bussey contends CAA's counsel's declaration is "[in]sufficient to excuse the failure to submit transcripts," and is "self-serving" and "incomplete."

Assuming for the sake of argument that CAA's counsel's declaration fails to comply with the rules as Bussey contends, we have discretion to decide whether to deny the petition because of this failure. (Cal. Rules of Court, rule 8.486(b)(4).) We exercise our discretion to allow the petition because, as will be shown, our decision rests on the merits of the superior court's order that CAA produce its business records, something that was plainly demonstrated by the superior court's written ruling contained in the record. Thus, we have before us a record that is sufficient for our review. (*Sherwood v. Superior Court* (1979) 24 Cal.3d 183, 186 [A party "seeking review of a ruling of the trial court by means of a petition for extraordinary writ must provide the appellate court with a record sufficient to permit such review"].)

Bussey's contention that "[t]here is no statement of decision in this case," is unpersuasive. The superior court's three-page "Ruling after court trial," filed on November 9, 2020, squarely presents the superior court's reasoning on the disputed issues presented to us. (See *In re Marriage of Rising* (1999) 76 Cal.App.4th 472, 476, fn. 7 ["we find that the trial court clearly intended that this written decision be a statement of decision . . . even though [the appealing party] did not request one"].)

3

request, stating the records sought were "not required to be maintained" under California law, and CAA was "not subject to" CPRA or FOIA.

In July 2019, Bussey filed a petition for writ of mandate in the superior court to compel CAA to give her access to the records. Bussey argued that CAA was a "Community Action Agency," "an explicit designation by local or state government" arising out of efforts by the federal government "to combat poverty in geographically designated areas." Bussey asserted that she was entitled to copies of CAA's records on two grounds: (1) CPRA, and (2) "Regulation § 100765" promulgated by the Department (Cal. Code Regs., tit. 22, § 100765 (Regulation 100765)).

According to Bussey, public access to CAA records is compelled by section 6252, which extends the reach of CPRA to local agencies. "Local Agency" is defined thusly: " 'Local agency' includes a county; city, whether general law or chartered; city and county; school district; municipal corporation; district; political subdivision; or any board, commission or agency thereof; other local public agency; or entities that are legislative bodies of a local agency pursuant to subdivisions (c) and (d) of Section 54952." (§ 6252, subd. (a).)

Bussey asserted CAA was a "local agency" subject to CPRA, because CAA was "another local public agency" as contemplated by section 6252, subdivision (a). Furthermore, Bussey asserted that CAA was "a grantee" within the meaning of Regulation 100765, a regulation promulgated the Department, which Bussey quoted as providing: "Any person who wishes to inspect or copy records regularly maintained by a grantee may do so after making a request. Information and records will be made available to the requestor in accordance with the Freedom of Information Act . . . ."

In a later pleading, Bussey described herself as an "involved member of the Butte County community" who had "work[ed] directly with" CAA "to bolster . . . funded services provided as part of the war on poverty." Bussey explained that she "became concerned with [CAA's] operations" after (a) she "heard complaints from [CAA's]

4

employees about perceived accounting and spending irregularities," and (b) CAA "rejected a $150,000 private donation needed to bridge the gap between federal block grant funds and [CAA's] budgetary requirement . . . because the donation requested an accounting of how the donated funds would be spent."

Bussey also quoted what she claimed was language on CAA's website—that " '[i]n January 1967, the Board of Supervisors of the County of Butte created the Economic Opportunity Commission of Butte County, Inc. (EOC; now known as Community Action Agency of Butte County, Inc.) in order to qualify for federal funds' "—and asserted that CAA was "created, organized and regulated by federal and state law," and was "a recipient of federal Community Block Grant funds as distributed by the State of California."  She attached several exhibits indicating CAA was a recent recipient of "federal Community Block Grant funds" via the State of California and the City of Chico.

CAA admitted that it was "a Community Action Agency . . . that . . . work[ed] to address poverty," but maintained that it was "a private entity, not subject to" CPRA.  As for Regulation 100765, CAA argued the provision applied "only to records related to the administration of" Community Block Grants that were "required to be maintained by the grantee under that regulatory scheme," and Bussey's requests concerned records *not* covered under the scheme.  CAA further argued that any interpretation of Regulation 100765 "impos[ing] broader public records access requirements than" federal law was an "[in]correct interpretation," because federal regulations prohibit a state from imposing public "records access requirements on non-Federal entities, such as CAA."

"[I]n an effort to promote transparency," CAA submitted "its 2015, 2016, and 2017 financial statements audited by a qualified independent auditor."  Those documents showed that in 2016 and 2017 CAA had annual total expenses of around $5.6 million and received "federal awards" funding totaling around $3.5 million (most of it "passed through" the Department).

5

In November 2020, after oral argument, the superior court issued a written ruling, ordering CAA to produce most of the records requested by Bussey in April 2019, including CAA's check registers, credit card statements, and travel reimbursements to CAA's chief executive officer. That ruling was based on the superior court's conclusion that CAA was a "public entity subject to both" FOIA and CPRA, "not as a matter of law, but based upon the factual situation presented." CAA was "an 'other local public agency' as included in the definition of 'local agency.' Gov't Code §6252(a). This determination [was] based upon the fact that [CAA] receive[d] federal grant funding and has been delegated authority to carry out public functions in Butte County."

The superior court "decline[d] to order that the State of California be joined in th[e] action as requested by" CAA, "as that matter [was] not properly before the [c]ourt."

Within 20 days of the superior court's order, CAA filed a petition for writ of mandate in this court, the statutory method for seeking review of a CPRA order of the superior court. (§ 6259, subd. (c).) In the caption of the petition, CAA named Bussey and the Department as real parties in interest.

We stayed the superior court's order and issued an order to show cause why the relief requested in the petition should not be granted.

## DISCUSSION

### I

### *CPRA*

A. *Legal Context*

1. Community Action Agencies

"A community action agency shall be a public or private nonprofit agency that fulfills all of the following requirements: [¶] (1) Has been designated by the director [of the Department] to operate a community action program. [¶] (2) Has a tripartite board

6

structure meeting the requirements of Section 12751.[3]  [¶]  (3) Has the power, authority, and capability to plan, conduct, administer, and evaluate a community action program, including the power to enter into contracts with other public and private nonprofit agencies and organizations to assist in fulfilling the purposes of this chapter."  (§ 12750, subd. (a).)

"A community action program is a locally planned and operated program comprising a range of services and activities having a measurable and potentially major impact on causes of poverty in the community or those areas of the community where poverty is a particularly acute problem."  (§ 12750, subd. (b).)

"CAAs provide services for underprivileged persons at the local level." (*Conecuh-Monroe Community Action Agency v. Bowen* (D.C. Cir. 1988) 852 F.2d 581, 584.)  In 1981, "Congress established the Community Services Block Grant Program, which provides lump sums to state governments.  One reason for adopting the block grant approach was to allow states to choose local providers of social services that the states themselves believe are best able to do the job."  (*Ibid.*)

2.  CPRA

"Enacted in 1968, CPRA declares that 'access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in

---

**3**     "Each community action agency shall have a board of directors conforming to the following requirements:  [¶]  (a) One-third of the members of the board are elected public officials, currently holding office, or their representatives, except that if the number of elected officials reasonably available and willing to serve is less than one-third of the membership of the board, membership on the board of appointive public officials may be counted in meeting this requirement.  [¶]  (b) At least one-third of the members are persons chosen in accordance with democratic selection procedures outlined in regulations promulgated by the department to assure that the members represent the poor and reside in the area served.  [¶]  (c) The remainder of the members are officials or members of business, industry, labor, religious, human services, education, or other major groups and interests in the community."  (§ 12751.)

this state.' (§ 6250.) In 2004, voters made this principle part of our Constitution. A provision added by Proposition 59 states: 'The people have the right of access to information concerning the conduct of the people's business, and, therefore, . . . the writings of public officials and agencies shall be open to public scrutiny.' (Cal. Const., art. I, § 3, subd. (b)(1).) Public access laws serve a crucial function. 'Openness in government is essential to the functioning of a democracy. "Implicit in the democratic process is the notion that government should be accountable for its actions. In order to verify accountability, individuals must have access to government files. Such access permits checks against the arbitrary exercise of official power and secrecy in the political process." ' [Citation.]" (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 615 (*City of San Jose*).)

"CPRA establishes a basic rule requiring disclosure of public records upon request. (§ 6253.) In general, it creates 'a presumptive right of access to any record created or maintained by a public agency that relates in any way to the business of the public agency.' [Citation.]" (*City of San Jose, supra*, 2 Cal.5th at p. 616, fn. & italics omitted.)

3. Statutory interpretation

" 'When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] "Furthermore, we consider portions of a statute in the context of the entire

8

statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' [Citation.]

"In CPRA cases, this standard approach to statutory interpretation is augmented by a constitutional imperative. [Citation.] Proposition 59 amended the Constitution to provide, 'A statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be *broadly* construed if it furthers the people's right of access, and *narrowly* construed if it limits the right of access.' (Cal. Const., art. I, § 3, subd. (b)(2), italics added.)" (*City of San Jose, supra*, 2 Cal.5th at pp. 616-617.)

4. "Other local public agency"

A "local agency" is a " 'public agency' " for CPRA purposes. (§ 6252, subd. (d).)

Under CPRA, " 'Local agency' includes a county; city, whether general law or chartered; city and county; school district; municipal corporation; district; political subdivision; or any board, commission or agency thereof; *other local public agency*; or entities that are legislative bodies of a local agency pursuant to subdivisions (c) and (d) of Section 54952." (§ 6252, subd. (a), italics added.)

"Broadly construed, the term 'local agency' logically includes not just the discrete governmental entities listed in section 6252, subdivision (a) but also the individual officials and staff members who conduct the agencies' affairs." (*City of San Jose, supra*, 2 Cal.5th at p. 620.)

The definition of an "other local public agency" for CPRA purposes is a question of first impression.[4]

---

[4] Courts have considered the phrase "other local public agency" for purposes of California's open meetings law, the Ralph M. Brown Act (§ 54950 et seq.) (Brown Act). (See, e.g., *McKee v. Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force* (2005) 134 Cal.App.4th 354, 356-363 [holding that an intergovernmental crime-fighting task force was a "local agency" and its board of directors and executive council were "legislative bodies" as defined by the Brown Act]; *Torres v. Board of Commissioners* (1979) 89 Cal.App.3d 545, 550-551 [deciding a county housing authority

CAA argues the superior court's ruling is not supported by substantial evidence, because the finding that CAA "ha[d] been delegated authority to carry out public functions" is "unsupported by the evidence." CAA also contends the ruling was "contrary to law," because CPRA does not "encompass[ ] private entities," even "implicitly."

Bussey contends that under Brown Act case law, CAA is an "other local agency," because—despite its "characteriz[ation] [of] itself as a 'private corporation' "—CAA receives federal funds and "is a government instrumentality created and regulated by state statutes."

In its "Response to Petition for Writ of Mandate," the Department contends the superior court's ruling was "in error to the extent" that it applied CPRA "to private organizations, including community action agencies, merely because such organizations accept federal grant money . . . for work that overlaps with typical public functions."[5]

---

was a "local agency" within the meaning of the Brown Act, rather than a "state agency" within the meaning of the State Agency Open Meeting Act (§ 11120 et seq.)].)

But while the Brown Act and CPRA "serve[ ] the same democratic purposes," (*International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 333, fn. 6), they are distinct statutory schemes with important differences in their texts and legislative histories (as we will explain below). " '[E]stablishing terminological uniformity' " between the Brown Act and CPRA, " 'is less important than discerning " 'the intent of the Legislature so as to effectuate the purpose' " of each individual statute.' " (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal. 4th 771, 782-783; see *Britts v. Superior Court* (2006) 145 Cal.App.4th 1112, 1127 ["absolute symmetry in the construction of" the same term appearing in different statutory schemes "is not required" where different legislative policies reveal distinct legislative intents behind the statutory schemes].)

[5]     Bussey argues that—in part because the "Department was not a party to the underlying lawsuit" and "made no attempt to intervene"—"the only possible status" of the Department "in this appeal is as *amicus curiae*," not a real party in interest.

We disagree. This is not an appeal, but an original proceeding. Bussey provides no authority for the proposition that, because the Department was not a party in the

10

Amicus curiae California Community Action Partnership Association argues the superior court's ruling was error in part because it "effectively reverses . . . § 12750(a), which allows for a community action agency such as CAA[ ] to establish itself as 'a public *or* private nonprofit agency.' "  The amici curiae brief of the California Community Economic Development Association, California Association of Food Banks, and the California Association of Nonprofits argues the superior court erred in ruling CAA had been delegated authority to carry out public functions, in part because CAA "did not perform activities that are traditionally *exclusive* to the State."

B.  *Analysis*

1.  Standard of Review

We conduct an independent review of respondent superior court's ruling, upholding factual findings if based on substantial evidence.  To the extent material facts are not disputed, and the issue involves the application of CPRA to those facts, we review de novo.  (*Associated Chino Teachers v. Chino Valley Unified School Dist.* (2018) 30 Cal.App.5th 530, 536; *CBS Broadcasting Inc. v. Superior Court* (2001) 91 Cal.App.4th 892, 906.)

2.  Legislative history

Because the phrase "other local public agency" permits more than one reasonable interpretation, we will consider the legislative history of the definition of "local agency" in section 6252.

CPRA, as originally enacted, contained the phrase "other local public agency" in its definition of " '[l]ocal agency.' "  (See Stats. 1968, ch. 1473, § 39, p. 2946.)  The

---

superior court, it was somehow improper for CAA to name the Department a real party in interest in the instant original proceeding.  (See *Tracy Press, Inc. v. Superior Court* (2008) 164 Cal.App.4th 1290, 1296-1297 ["The filing of a petition for writ of mandate in this court, even though it follows denial of the petition in the superior court, is an original proceeding, not an appeal," and because "the petition in a mandamus proceeding serves as the complaint, it must name all of the parties"].)

available legislative history sheds little light on what the Legislature meant when employing the phrase. But it is worth noting that the law's sponsor, in a letter urging the Governor to sign the legislation, explained that "the basic philosophy of the bill is that the burden is upon the *governmental agency* to show that a given record should not be made public. This then allows a citizen to see a public record or demand that the *governmental entity* involved show that it should not be public."[6] (Assembly member William T. Bagley, letter to Governor Ronald Reagan regarding Assem. Bill No. 1381 (1968 Reg. Sess.) Aug. 15, 1968, Governor's chaptered bill files, ch. 1473, italics added.)

Language in CPRA's definition of "local agency" changed for the first time in 1991, to read: " 'Local agency' includes . .. other local public agency; *or nonprofit organizations of local government agencies and officials which are supported solely by public finds*."[7] (Stats. 1991, ch. 181 (Assem. Bill No. 788), § 1, p. 1404, italics added; see Historical and Statutory Notes, 32A pt. 3, West's Ann. Gov. Code (2016 ed.) foll. § 6252, pp. 309-310.)

CPRA's definition of "local agency" changed a second time in 1998, to read: " 'Local agency' includes . . . other local public agency; or *nonprofit entities that are legislative bodies of a local agency pursuant to subdivisions (c) and (d) of Section*

---

[6] "While there are often limits to what an interpreter may reasonably infer from an individual legislator's letter [citation], we have considered letters expressing the views of a bill's *sponsor* where those views are fully consonant with the statutory language and the history of the legislation." (*Larkin v. Workers' Comp. Appeals Bd.* (2015) 62 Cal.4th 152, 164, fn. 10, italics added.)

[7] The bill's sponsor apparently introduced the legislation "due to difficulties he had in obtaining information from the County Supervisors Association of California" and out of a desire to "uncover abuses of taxpayer funds." (Governor's Office of Planning & Research, Enrolled Bill Rep. on Assem. Bill No. 788 (1991-1992 Reg Sess.) July 19, 1991, p. 2.)

*54952*."**[8]**   (Stats. 1998, ch. 620 (Sen. Bill No. 143), § 2, p. 4118, italics added; see Historical and Statutory Notes, 32A pt. 3, West's Ann. Gov. Code (2016 ed.) foll. § 6252, p. 310.)

The aim of the 1998 amendment to section 6252's definition of "local agency" was to "include in the [CPRA] private corporations and other entities created by a government agencies [*sic*] that carry out delegated public authority or that receive public funds, such as economic development corporations."  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 143 (1997-1998 Reg. Sess.) as amended Jan. 5, 1998, p. 4.)

Earlier versions of the bill sought to replace the language added in 1991 with: "nonprofit organizations or entities that are legislative bodies of a local agency pursuant to subdivisions (c) and (d) of Section 54952."  (Sen. Amend. to Sen. Bill No. 143 (1997-1998 Reg. Sess.) Jan. 5, 1998, § 2; Assem. Amend. to Sen. Bill No. 143 (1997-1998 Reg. Sess.) Jun. 17, 1998, § 2.)  But days after a committee bill analysis expressed "[d]rafting [c]oncerns" with that proposed text—because its language "might be construed to require non-profits to be subject to the [CPRA]"—and suggested amending the text "to clarify

---

**[8]**    As relevant here, section 54952 provides:  "As used in this chapter, 'legislative body' means:  [¶]  (a) The governing body of a local agency or any other local body created by state or federal statute.  [¶]  (b) A commission, committee, board, or other body of a local agency, whether permanent or temporary, decisionmaking or advisory, created by charter, ordinance, resolution, or formal action of a legislative body. . . .  [¶] (c)(1) A board, commission, committee, or other multimember body that governs a private corporation, limited liability company, or other entity that either:  [¶]  (A) Is created by the elected legislative body in order to exercise authority that may lawfully be delegated by the elected governing body to a private corporation, limited liability company, or other entity.  [¶]  (B) Receives funds from a local agency and the membership of whose governing body includes a member of the legislative body of the local agency appointed to that governing body as a full voting member by the legislative body of the local agency.  [¶]  . . .  [¶]  (d) The lessee of any hospital . . . where the lessee exercises any material authority of a legislative body of a local agency delegated to it by that legislative body whether the lessee is organized and operated by the local agency or by a delegated authority."

that the bill applies to nonprofit organizations that are legislative bodies of a local agency, *as specified*," the earlier language was removed, and the final language was added. (Assem. Com. on Gov. Organization, Analysis of Sen. Bill No. 143 (1997-1998 Reg. Sess.) as amended Jun. 17, 1998, pp. 2-3, italics added; Sen. Amend. to Sen. Bill No. 143 (1997-1998 Reg. Sess.) Jun. 24, 1998, § 2.) So instead of "nonprofit organizations *or* entities that are legislative bodies of a local agency . . ." the final version of the bill said "nonprofit entities *that are* legislative bodies of a local agency . . . ."

The legislative history of the 1998 changes to section 6252 reflects a concern that the definition of "local agency" in CPRA *not* be interpreted to sweep so broadly that it include local nonprofit organizations *generally*, but rather *only those nonprofits that were legislative bodies of a local agency* within the meaning of section 54952.

Language in the definition of "local agency" was altered a third time in 2002, to read: " 'Local agency' includes . . . other local public agency; or *entities* that are legislative bodies of a local agency pursuant to subdivisions (c) and (d) of Section 54952." (Stats. 2002, ch. 1073 (Assem. Bill No. 2937), § 1, italics added.) It appears the Legislature wanted to ensure that for-profit entities (that were legislative bodies of local agencies) would not be able avoid CPRA, simply because they were *not* "nonprofit entities." An analysis of the bill explained that "[o]ne superior court judge ha[d] interpreted" CPRA as inapplicable to "for-profit entities that [we]re legislative bodies created by a local agency, even when subject to the Brown . . . Act." Assembly Bill No. 2937 was "intended to correct th[at] apparent mistake." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 2937 (2001-2002 Reg. Sess.) as amended Apr. 16, 2002, p. 2.)

Our review of the legislative history of the changing definition of "local agency" in section 6252 reflects the Legislature's (evolving) aim to include a *very limited* universe of local nongovernmental entities within CPRA's scheme.

When the Legislature passed CPRA in 1968 it was concerned with public access to the records of *governmental* entities. When the Legislature wanted to subject certain

14

local nongovernmental entities to CPRA, it did so expressly in 1991 with Assembly Bill No. 788, limiting the expansion of the definition of "local agency" to "nonprofit organizations of local government agencies and officials" that were "supported solely by public finds." When the Legislature wanted to *alter* the universe of local nonprofit entities subject to CPRA (to nonprofits that were legislative bodies of a local agency), it did so in 1998 with Senate Bill No. 143, careful to avoid language that might have been interpreted to include local nonprofit organizations *generally*. And when, in 2002, the Legislature removed the word "nonprofit" from section 6252, it did so to ensure that all entities that were legislative bodies of local agencies (nonprofit and for-profit) would be subject to CPRA; not to expand the universe of local nonprofit entities subject to CPRA.

Accordingly, in light of this legislative history, we conclude the Legislature intended the "other local public agency" definition of "local agency" in section 6252 to include governmental entities, not nongovernmental entities like nonprofits.

3. Other statutory construction considerations

In *City of San Jose*, our Supreme Court explained that Proposition 59, approved by the voters at the November 2, 2004 General Election, mandates that a statute be "*broadly* construed if it furthers the people's right of access, and *narrowly* construed if it limits the right of access.' (Cal. Const., art. I, § 3, subd. (b)(2), italics added.)" (*City of San Jose, supra*, 2 Cal.5th at p. 617.)

Also in that opinion, our Supreme Court observed that CPRA's definition of local agency "is worded more broadly than the state agency definition," as "[s]ection 6252, subdivision (a) states that the term local agency 'includes' a county, city, or one of several other listed entities," whereas the state agency definition "is couched in more restrictive language: ' "State agency" *means* every state office, officer . . . ,' and other listed entities. (§ 6252, subd. (f), italics added.)" (*City of San Jose, supra*, 2 Cal.5th at p. 622, fn. 6.) "In statutory drafting," the court explained, "the term 'includes' is ordinarily one 'of enlargement rather than limitation.' [Citation.] 'The "statutory

15

definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions." ' [Citation.]" (*Ibid.*)

In light of (i) "includes" in CPRA's definition of a local agency,[9] and (ii) Proposition 59's mandate that we broadly construe a statute if it furthers the people's right of access,[10] we conclude a nonprofit entity may be an "other local public agency" within the meaning of section 6252, subdivision (a), but only in exceptional circumstances, such as when, as a practical matter, the nonprofit *operates as a local public entity*. Faced with a similar issue, the Supreme Court of Washington rejected the contention that Washington's statutory public records law could "never reach the records" of a private nonprofit entity and articulated a four-factor test for determining whether a private entity should be treated as the functional equivalent of a governmental agency. (*Fortgang v. Woodland Park Zoo* (2017) 187 Wn.2d 509, 512 [387 P.3d 690] (*Fortgang*).)

The factors are: "(1) whether the entity performs a government function, (2) the extent to which the government funds the entity's activities, (3) the extent of government

---

**9**    The Brown Act's definition of "local agency," in contrast to CPRA's definition, uses the term "means," not "includes." (See § 54951.)

**10**    Although Proposition 59, by its own terms did not "modif[y] the right of privacy guaranteed by Section 1 or affect[ ] the construction of any statute, court rule, or other authority to the extent that it protects that right to privacy," (Cal. Const., art. I, § 3, subd. (b)(3)), corporations have no California right to privacy that is protected by the California Constitution or statutory law. The nature and scope of a corporate entity's right to privacy is a question for the courts that " 'depend[s] on the circumstances' " of a given legal dispute. (See *Ameri-Medical Corp. v. Workers' Comp. Appeals Bd.* (1996) 42 Cal.App.4th 1260, 1287-1288; accord *SCC Acquisitions, Inc. v. Superior Court* (2015) 243 Cal.App.4th 741, 755-756.)

involvement in the entity's activities, and (4) whether the entity was created by the government." (*Fortang, supra*, 387 P.3d at p. 695.)

The court ruled that the test developed in Washington appellate courts that "derives from case law interpreting" FOIA, "further[ed]" the purposes of Washington's Public Record Act, "by preventing governments from evading public oversight through creative contracting," and was "consistent with . . . the approach taken by numerous other jurisdictions interpreting similar transparency laws." (*Fortang, supra*, 387 P.3d at p. 693.)

The government function factor is about " 'core' government functions, [citation], or functions that could not be delegated to the private sector." (*Fortgang, supra*, 387 P.3d at p. 698.) The government funding factor primarily asks whether the *majority* of a private entity's funding is "attributable to public sources." (*Id.* at p. 701.) The third factor is about "day-to-day control" of a private entity, rather than "mere regulation" of the entity, by a government agency. (*Id.* at pp. 701-702.) The last factor is an inquiry into the private entity's "origin": Did a government agency incorporate the entity or create the entity "pursuant to 'special legislation?' "[11] (*Fortgang, supra*, 387 P.3d at p. 702.)

The test articulated by respondent superior court is a two-factor test that would sweep into CPRA many more local nonprofit entities than the Legislature and the voters, via Proposition 59, likely intended, viz.: (1) does the nonprofit receive *any* government

---

[11] (Cf. *O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1075 [concluding a statute could not "be characterized as special legislation. (See Cal. Const., art. IV, § 16 [authorizing the enactment of statutes applicable to particular cities or counties]; *White v. State of California* (2001) 88 Cal.App.4th 298, 305 [Legislature must have rational basis for singling out a city or county to be ' "affected by [a special] statute" ']; *Baldwin* [*v. County of Tehama* (1994) 31 Cal.App.4th 166, 166], 177 [uncodified enactments granting limited powers over groundwaters to 'specifically identified special districts' described as ' "special acts" '])"].)

funds? and (2) does the nonprofit perform "public functions?" The test we propose here offers a mode of analysis for determining whether a private nonprofit, like CAA, is an "other local public agency" within the meaning of section 6252, subdivision (a) that is nuanced and sensitive to the intricacies that may be present in the relationships between local governments and local nonprofits. This test is preferable to respondent superior court's, and we adopt and apply it here.

a) Does CAA perform a core government function[12]

Poverty alleviation in California is *not* a core government function that cannot be delegated to the private sector. (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 991 ["[Welfare and Institutions Code] section 17000 imposes upon counties a mandatory duty to 'relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident,' when those persons *are not relieved and supported by some other means*," (italics added)]; Welf. & Inst. Code, § 17000 ["Every county and every city and county shall relieve and support all . . . poor, indigent persons . . . when such persons *are not supported* and relieved *by their relatives or friends*, by their own means, or by state hospitals or other state *or private institutions*" (italics added)].)

b) The extent to which the government funds CAA activities

Documents CAA submitted in the superior court indicated that, at least in 2016 and 2017, the majority of CAA's funding was attributable to public sources, as CAA had annual total expenses of around $5.6 million, and received annual public funding totaling at least $3.5 million.

---

**12** This inquiry into "core" government functions, is consistent with the notion advanced by amici curiae California Community Economic Development Association, et al., that only those activities of a nonprofit "that are traditionally *exclusive* to the State," be considered when answering the question whether a nonprofit might be an "other local public agency."

c) The extent of government involvement in CAA day-to-day activities

Nothing in the record indicates the extent of governmental involvement (if any) in CAA's day-to-day activities. Accordingly, there is not substantial evidence for a determination on this factor.

d) Whether CAA was created by the government

The record is inconclusive regarding CAA's origins. Because the nonprofit "was incorporated solely by private individuals," the court could not "attribute its 'origin' to special legislation or other government action." (*Fortgang, supra*, 387 P.3d at p. 702.)

Though Bussey purportedly quoted CAA's Web site, that "[i]n January 1967, the Board of Supervisors of the County of Butte created the Economic Opportunity Commission of Butte County, Inc. (EOC; now known as Community Action Agency of Butte County, Inc.) in order to qualify for federal funds," the record contains no indication that CAA responded to this characterization of its Web site.[13]

Accordingly, there is not substantial evidence for a determination on this factor.

The first factor weighs against a conclusion that CAA operates as a local public entity, the second factor weighs in favor of such a conclusion, and there is not substantial evidence for conclusive determinations as to the third and fourth factors. Because only one of the four factors weighs in favor of a conclusion that CAA operates as a local public entity, this is not an exceptional situation counseling in favor of a decision CAA is an "other local public agency" within the meaning of section 6252, subdivision (a).

---

[13] Bussey did not assert the nature CAA's origins in her verified petition for writ of mandate. And in any event, the Web site statement suggests only that the "Economic Opportunity Commission of Butte County" was created by Butte County supervisors. It does not sufficiently illuminate the distinct origins of CAA, per se.

19

### 4. Conclusion

There is not substantial evidence supporting respondent court's ruling that CAA is an "other local public agency" within the meaning of section 6252, subdivision (a). We will order the superior court to vacate its order that CAA produce records requested by Bussey on April 12, 2019. The court may schedule further proceedings to consider Bussey's petition in light of our decision in this original proceeding.

## II

### *FOIA & Regulation 100765*

#### A. *Legal Context*

"FOIA reflects 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.' " (*Department of Defense v. FRLA* (1994) 510 U.S. 487, 494.) But "FOIA applies only to federal and not to state agencies." (*Grand Central Partnership, Inc. v. Cuomo* (2d Cir. 1999) 166 F.3d 473, 484 (*Grand Central Partnership*); accord *Rahim v. District Attorney for the Suffolk District* (Mass. 2020) 486 Mass. 544, 549-550 [159 N.E.3d 690, 697] (*Rahim*).)

The Legislature "may delegate some quasi-legislative or rulemaking authority to administrative agencies," but a state agency "has only as much rulemaking power as is invested in it by statute." (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 299.) Thus, " 'no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute.' (Gov. Code, § 11342.2.)" (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 321.)

"Whether judicial deference to an agency's" legal interpretation "is appropriate and, if so, its extent—the 'weight' it should be given—is . . . fundamentally situational. A court assessing the value of an interpretation must consider a complex of factors material to the substantive legal issue before it . . . ." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 (*Yamaha*), italics omitted.) Among the

factors courts should consider are whether the interpretation was "prepared for litigation" (*Wiseman Park, LLC v. Southern Glazer's Wine & Spirits, LLC* (2017) 16 Cal.App.5th 110, 118, fn. 9.)  In any event, " '[a] court is more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' "  (*Yamaha*, at p. 12.)

Section 12781, subdivision (d), authorizes the Department to "[p]romulgat[e] . . . regulations . . . that are necessary and appropriate for the effective administration of th[e] chapter" that contemplates community action agencies.

The Department's Regulation 100765 provides:  "Any person who wishes to inspect or copy records regularly maintained *by a grantee* may do so after making a request.  Information and records will be made available to the requestor in accordance with the Freedom of Information Act (5 U.S.C. 552), except for information and records which are exempt from the requirements of disclosure pursuant to the Federal Privacy Act of 1974, as amended."  (Italics added.)

45 Code of Federal Regulations part 75.364(a) provides, in relevant part: "Records of non-Federal entities.  The [U.S. Department of Health & Human Services] awarding agency . . . and the pass-through entity, or any of their authorized representatives, must have the right of access to any documents, papers, or other records of the non-Federal entity *which are pertinent to the Federal award*, in order to make audits, examinations, excerpts, and transcripts."  (Italics added.)

45 Code of Federal Regulations part 75.364(c) provides, in relevant part: "Expiration of right of access. . . .  HHS awarding agencies and pass-through entities *must not impose any other access requirements upon non-Federal entities*."  (Italics added.)

21

B. *Analysis*

As an initial matter, we note the superior court's ruling that CAA "is a public entity subject to . . . [FOIA]" does not reference Regulation 100765, though Bussey did invoke it in her July 2019 petition. We also note the superior court premised its ruling that CAA is "subject to" FOIA on "the factual situation" presented.

The superior court's reasoning was mistaken, as FOIA applies only to federal agencies, not state or local agencies. (*Grand Central Partnership, supra*, 166 F.3d at p. 484; *Rahim*, *supra*, 159 N.E.3d at p. 697.) But we review the superior court's ruling, not its reasoning. (*Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc*. (2021) 59 Cal.App.5th 995, 1002.)

In addition to the incorrect contention that CAA is subject to FOIA, Bussey argues the superior court's order that CAA produce records Bussey requested on April 12, 2019, was proper because "it is clear that, when the drafters of [Regulation] 100765 imposed transparency obligation on 'grantees' they were referring to community action agencies like [p]etitioner."

CAA contends an interpretation of Regulation 100765 that requires public access to the records Bussey seeks: (1) would "exceed[ ] the Department's regulatory authority" and (2) "conflict with" 45 Code of Federal Regulations part 75.364, as "only those records that CAAs are required to maintain as a 'grantee,' . . . are subject to public disclosure."

The Department agrees with CAA that the federal regulation "logically bars a state pass-through entity, like [the Department], from using its regulatory authority to promulgate rules that afford public access under FOIA to documents held by a sub-grantee where those documents are not 'pertinent to' " a federal grant.

Because we believe the Department is " 'intimately familiar' " with its own Regulation 100765 and " 'sensitive to the practical implications of one interpretation over another,' " (*Yamaha, supra*, 19 Cal.4th at p. 12) we defer to the Department's reasonable

22

interpretation, and conclude Regulation 100765 does not contemplate a *general* right of public access to all records of "grantees" like CAA.[14] (Cf. *Ortega v. Johnson* (2020) 57 Cal.App.5th 552, 564 [considering a state agency's argument "that if appellants' interpretation of the plain language of" the agency's manual of policies and procedures was "correct, [the agency's] regulation [was] not legal"].)

Bussey's contention that "the drafters of [Regulation] 100765 . . . were referring to community action agencies like [p]etitioner" when they "imposed transparency obligation on 'grantees,' " misperceives the relevant inquiry. The question—vis-à-vis Regulation 100765—is not "to *whom* was the Department referring?" but "to *which* '*records* regularly maintained by a grantee' was the Department referring?" The Department's interpretation that it was referring only to records "pertinent to" a federal grant is persuasive, especially in light of 45 Code of Federal Regulations part 75.364(a)'s language contemplating "access" to documents "of the non-Federal entity *which are pertinent to the Federal award*" and 45 Code of Federal Regulations part 75.364(c)'s language prohibiting imposition of "*any other access requirements* upon non-Federal entities." (Italics added.)

To the extent the superior court ruled that Regulation 10075 requires CAA to provide public access to all of its records generally, that ruling was error.

---

[14] In light of this conclusion, we need not consider CAA's contention that *Bussey's* interpretation of Regulation 100765, if correct, would be beyond the scope of the Department's regulatory authority, and therefore invalid.

## DISPOSITION

CAA's petition for writ of mandate is granted.  Let a peremptory writ of mandate issue directing the superior court to vacate its order of November 9, 2020, that CAA produce records requested by Bussey on April 12, 2019.  The order to show cause is discharged and the stay issued by this court on December 8, 2020, is vacated upon finality of this opinion.

The superior court may schedule further proceedings to consider the merits of Bussey's petition for writ of mandate in Butte County Superior Court case No. 19CV02159 in light of, and consistent with, the reasoning in this opinion.

CAA shall recover its costs in this proceeding.  (Cal. Rules of Court, rule 8.493.)


_____/s/_____
RAYE, P.J.



We concur:



_____/s/_____
DUARTE, J.



_____/s/_____
HOCH, J.